STATE OF NORTH CAROLINA v. HORACE EDWARD WILSON

No. 610A83

(Filed 4 June 1985)

1. **Jury § 6— capital case—denial of sequestration and individual voir dire of jurors**

   Defendant's arguments that the collective *voir dire* of prospective jurors in a capital case made the jurors aware of prejudicial matters and inhibited their candor and that it permitted prospective jurors to become educated as to responses which would enable them to be excused from the panel were mere speculation and did not establish that the trial court abused its discretion in denying defendant's motion for sequestration and individual *voir dire*. G.S. 15A-1214(j).

2. **Jury § 2— supplemental jurors summoned by sheriff—failure to exhaust peremptory challenges—absence of prejudice**

   Defendant failed to show that he was prejudiced when the trial court ordered the sheriff to randomly recruit jurors during the selection process where the twelfth juror seated was one of the supplemental jurors summoned by the sheriff, and defendant still had one peremptory challenge at the time such juror was accepted but failed to exhaust his peremptory challenges. G.S. 9-11(a).

3. **Jury § 6.4— opposition to death penalty—rehabilitation of challenged jurors— questions concerning duties of citizen as juror**

   The trial court did not err in denying defendant the opportunity to "rehabilitate" jurors challenged for cause by the State due to their opposition to the death penalty by asking questions in the nature of comments by defense counsel concerning the obligations and duties of a citizen as a juror.

4. **Jury § 7.12— excusal of jurors for capital punishment beliefs**

   Prospective jurors challenged for cause due to their beliefs regarding capital punishment were properly dismissed where the record clearly indicates that all of the prospective jurors excused on this basis stated that they could not or would not vote to return a sentence of death under any circumstances.

5. **Criminal Law § 66.3— impermissibly suggestive identification procedures**

   Identification evidence must be suppressed on due process grounds where the facts show that the pretrial identification procedure was so suggestive as to create a very substantial likelihood of irreparable misidentification.

6. **Criminal Law § 66.6— irreparable misidentification—factors to be considered**

   The factors to be examined to determine the likelihood of irreparable misidentification include: (1) the opportunity of the witness to view the individual at the time of the event; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the individual; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the event and the confrontation. Even in cases where the iden-

State v. Wilson

tification procedure has been suggestive, the court is to use these factors to determine whether under the "totality of the circumstances" the identification was reliable.

7. **Criminal Law §§ 66.6, 66.15— suggestive pretrial identification procedures—no substantial likelihood of misidentification—independent origin of in-court identification**

Although pretrial photographic and lineup identification procedures were made suggestive by an officer's comments to the witness that she should point out the individual who was at her motel on the night in question, the evidence supported the trial court's findings and conclusions that the pretrial identification procedures did not create a substantial likelihood of misidentification and were not impermissibly suggestive. The evidence also supported the trial court's ruling that the witness's in-court identification of defendant was admissible as being of independent origin based solely upon the witness's observations of defendant at the scene of the crime.

8. **Criminal Law § 50.2— testimony that victim "killed"—no invasion of province of jury**

A witness's testimony that he sold decedent a watch a month before he "got killed" did not amount to a prejudicial invasion of the province of the jury in a murder case since there was no suggestion that defendant killed the victim or that the victim died as the result of criminal conduct.

9. **Criminal Law § 71— instantaneous conclusion of the mind—admissibility as shorthand statement of fact**

A witness's testimony that, after seeing the victim lying in a parking lot covered with blood, she "ran into the room where [the victim] had been stabbed and got a set of keys" was admissible as a shorthand statement of fact based upon an instantaneous conclusion of the mind.

10. **Criminal Law § 169.7— evidence admitted without objection—waiver of prior objection to similar evidence**

Where evidence is admitted without objection, the benefit of a prior objection to the same or similar evidence is lost, and the defendant is deemed to have waived his right to assign as error the prior admission of the evidence.

11. **Criminal Law § 80— title history of automobile—relevancy in murder case—failure to match identification or license tag numbers**

A certified copy of the title history of a 1975 Chevrolet Vega showing defendant as the owner of the vehicle at the time of a robbery-murder was relevant in a prosecution for the murder where the State's evidence tended to show that a blue Vega was near the crime scene at about the time the victim was killed and that defendant was seen driving a blue Vega earlier that day. The evidence was not rendered inadmissible by the fact that the witness through whom the title certificate was introduced failed to testify that the vehicle identification or license tag number for the Vega in the certificate of title matched those of the Vega driven by the defendant or the one seen on the day of the crimes.

**12. Criminal Law § 80— admission of business records**

Business records made in the ordinary course of business at or near the time of the transaction involved are admissible as an exception to the hearsay rule if they are authenticated by a witness who is familiar with them and the system under which they are made.

**13. Criminal Law § 80.1— authentication of business records**

The authenticity of business records may be established by circumstantial evidence, and there is no requirement that the records be authenticated by the person who made them. Furthermore, if the records themselves show that they were made at or near the time of the transaction in question, the authenticating witness need not testify from personal knowledge that they were made at that time.

**14. Criminal Law § 80.1— authentication of business records**

Although a witness did not explicitly testify that records were made in the normal course of business and at or near the time of the transactions described therein, the witness's testimony when coupled with the records themselves established these facts so that the records were admissible as business records in a robbery-murder case where the witness identified the documents as a motel's daily records which indicated the number of rooms rented and the amount of money received for each room; the witness further testified that the records were in deceased's handwriting; the records showed daily entries for specific dates and were therefore self-authenticating as to the time at which they were made; and the witness owned a motel and was thus familiar with general practices in the motel business regarding the recording of rentals and receipts.

**15. Homicide § 21.6— first-degree murder—felony murder rule—sufficiency of evidence**

The State's evidence was sufficient to support inferences that the victim was killed during the commission of an armed robbery and that defendant perpetrated or aided in the perpetration of the robbery and killing so as to support defendant's conviction of first-degree murder under the felony murder rule where it tended to show: the victim, a motel manager, was found lying in the motel parking lot covered with blood shortly after 11:00 p.m.; he stated that two or three black men had stabbed and robbed him; the victim's wristwatch and the motel receipts for the previous three days were missing; two black males were seen sitting in a blue Vega near the crime scene at about the time the crimes occurred; defendant was observed driving a blue Vega earlier in the same day; sometime between 11:00 and 11:30 p.m. defendant and another black male inquired about renting a room at another motel which was located only a block from the motel managed by the victim; a vehicle title certificate indicated that defendant owned a 1975 Chevrolet Vega on the date of the crimes; two or three weeks after the crimes were committed, defendant's girl friend was seen in possession of the victim's wristwatch; and approximately a week later defendant sold the watch to an acquaintance.

State v. Wilson

**16. Larceny § 7.4; Robbery § 4.3— possession of recently stolen property—control by defendant—sufficiently recent possession**

Evidence tending to show that defendant, his girl friend and their two children checked into a motel on the day a robbery-murder victim's watch disappeared when he was killed by two or three black males and that the watch was seen thereafter only in the hands of the girl friend or the defendant until it was sold by defendant was sufficient to support a finding that the watch was in defendant's custody and control at all pertinent times so as to permit the application of the doctrine of possession of recently stolen goods to link defendant to the crimes. Furthermore, evidence that the girl friend had the watch approximately one to three weeks after the killing and that defendant was seen with it a week later showed sufficiently recent possession of the watch by defendant to support a reasonable inference of defendant's guilt under the doctrine of possession of recently stolen property.

**17. Criminal Law § 113.7— charge on acting in concert—sufficient evidence**

Evidence tending to show that two or more men robbed and killed the victim and that defendant was one of the perpetrators was sufficient to support an instruction on the concept of acting in concert although there was no direct evidence to show that defendant was present when the crimes were committed.

**18. Homicide § 32.1— first-degree murder—instruction on premeditation and deliberation theory—harmless error**

The State's evidence was sufficient to justify the submission to the jury of a first-degree murder charge on the theory of premeditation and deliberation. However, assuming that the evidence was insufficient to support such an instruction, defendant was not prejudiced thereby where he was convicted of first-degree murder specifically on the basis of the felony murder rule.

**19. Indictment and Warrant § 8.4; Homicide § 12.1— first-degree murder—election of theory not required**

Where the State made out a prima facie case on both the theories of felony murder and premeditation and deliberation, the State was not required to elect the theory under which the first-degree murder case would be submitted to the jury.

**20. Criminal Law §§ 102, 135.4— first-degree murder—penalty phase—no right to both opening and closing arguments**

The trial court did not err in denying defendant's motion to present both the opening and closing arguments at the penalty phase of a first-degree murder trial since G.S. 15A-2000(a)(4) gives a defendant the right to make only the final argument at the penalty phase. Even had this been error, the fact that defendant received a life sentence rather than the death penalty would have made the error harmless.

**21. Criminal Law § 132— setting aside verdict as contrary to weight of evidence**

The decision whether to grant or deny a motion to set aside the verdict as being against the greater weight of the evidence is vested in the sound discretion of the trial court and is not reviewable absent a showing of an abuse of that discretion.

APPEAL by the defendant from the judgment of *Judge Claude S. Sitton*, entered August 25, 1983 in Superior Court, GASTON County.

The defendant was charged in bills of indictment, proper in form, with murder and armed robbery. He pleaded not guilty to both charges. A jury found the defendant guilty of armed robbery and first degree murder based on the felony murder rule. Following a sentencing hearing conducted under N.C.G.S. 15A-2000, the jury found one aggravating circumstance, that the defendant had been previously convicted of a felony involving the use of violence to the person. The jury also found five mitigating circumstances. The jury concluded that although the mitigating circumstances were insufficient to outweigh the aggravating circumstance, the aggravating circumstance was not sufficiently substantial to call for the imposition of the death penalty. Based upon the jury's recommendation, the trial court entered judgment sentencing the defendant to life imprisonment. As the armed robbery was the underlying felony upon which the first degree murder conviction was based, the trial court arrested judgment on the armed robbery charge. The defendant appealed to the Supreme Court as a matter of right under N.C.G.S. 7A-27(a). Heard in the Supreme Court March 14, 1985.

*Lacy H. Thornburg, Attorney General, by Ralf F. Haskell, Special Deputy Attorney General for the State.*

*Kellum Morris, Assistant Public Defender for Judicial District Twenty-Seven-A, for the defendant appellant.*

MITCHELL, Justice.

The defendant brings forward numerous assignments of error in which he contends that certain evidence was improperly admitted, that errors were made concerning the selection of jurors, that the jury was improperly instructed on certain facets of the case and that the evidence presented by the State was insufficient to permit the case against him to be submitted to the jury. We conclude that the defendant received a fair trial free from prejudicial error.

This case arises out of events occurring on the evening of September 16, 1982 at the Bishop Motel located in Belmont, near

Charlotte, North Carolina. The State presented evidence tending to show that at approximately 12:00 noon on September 16, 1982, the defendant checked into the 321 Motel in Charlotte with a woman and two young children. The defendant was driving a blue Chevrolet Vega.

Mrs. Ruparib Jethwa, the victim's aunt, testified that she and her husband operated the Stonewall Motel located in Belmont, North Carolina. The Bishop Motel, which was managed by the victim, Probhatsing Dipubha Jadeja, was located about a block away from the Stonewall Motel. Sometime between 11:00 and 11:30 p.m. on September 16, 1982, the defendant with another black male entered the office of the Stonewall Motel and inquired about renting an apartment. During the ensuing conversation, the witness saw what looked like a knife partially concealed in the defendant's pocket. Upon being informed that an apartment could only be rented in the daytime hours, the defendant stated that they would return in the morning. He and his companion then left.

Ray Collins testified that he owned an automotive parts store located next door to the Bishop Motel. He and an employee, Wanda Miller, stayed late at the store the night of September 16, 1982. Shortly after 11:00 p.m., as they were preparing to close, Collins observed two black males walking toward the Bishop Motel. As Collins and Miller left the store they observed a blue Vega pull up to the corner of the building. A man got out of the car and went to a nearby telephone booth. Collins and Miller got into Collins' car and left. The blue Vega followed them for approximately a block and then turned to go back toward the Bishop Motel.

Ralph Cohn testified that he was living at the Bishop Motel on September 16, 1982 and had been residing there for approximately four months prior to that date. During this period Cohn and the victim Jadeja had become close friends. On the evening of September 16, 1982, Cohn, his girl friend and Jadeja had dinner together. Afterwards Cohn and Jadeja drove to the Stonewall Motel and stopped at a store to buy a pack of cigarettes. They returned to the Bishop Motel around 10:50 p.m. and planned to watch a ballgame together at 11:00 p.m.

Robert Fullerton was also living at the Bishop Motel on September 16, 1982. At approximately 11:00 p.m. he went to his car. In the parking lot he heard someone moving. He discovered Jade-

ja lying in the parking lot covered with blood. Jadeja stated that he had been stabbed and robbed by three black men. Fullerton then ran to a phone booth beside the Bishop Motel to call the police. A black male was in the phone booth, however, and Fullerton ran back to the crowd which had gathered around Jadeja.

In the meantime Ralph Cohn had been informed that Jadeja had been attacked. He knelt beside Jadeja and asked him what happened. Jadeja told Cohn that two black males had stabbed him. At that time the victim was not wearing the wristwatch that he had been wearing when Cohn had last seen him a few minutes earlier. Cohn then ran to the motel office to phone for assistance and discovered that the telephone had been ripped off its hook. There were papers scattered throughout the office and blood was all over the office as well. Cohn then went to a nearby house and called the Belmont Police Department.

Officer Robert Johnston, a member of the Gaston County Police Department assigned to the Identification Section of the department, testified that at approximately 11:25 p.m. on the evening of September 16, 1982, he was instructed to go to the Bishop Motel. He arrived about twenty minutes later and went to the motel office. He found the office disarranged with the telephone, a key, an insurance folder, a small envelope covered with black tape and other items scattered on the floor. He proceeded to photograph the room.

Byron Carpenter, a member of the South Point Lifesaving Crew, testified that he and two other crew members arrived at the Bishop Motel at about 11:20 p.m. They found Jadeja lying in the motel parking lot, his shirt covered with blood. Carpenter cut away the victim's shirt and discovered a stab wound to the upper left quadrant of his chest. The victim was placed in an ambulance which proceeded to Gaston Memorial Hospital. Jadeja went into full cardiac arrest enroute to the hospital and efforts to resuscitate him were unsuccessful.

Dr. Phillip Leone was qualified and accepted by the court as an expert in the field of pathology. He testified that he performed an autopsy on the body of Jadeja which revealed that the victim had sustained a laceration beneath his chin and abrasions over his left eye, over the left hip and to the left temple. He also found a stab wound to the victim's chest a quarter of an inch wide and ap-

proximately three inches deep which penetrated the heart. Dr. Leone stated that in his opinion the chest wound was caused by a knife and that the cause of Jadeja's death was this stab wound.

Bhartsang Jadeja, the victim's brother, testified that the day after the stabbing he went to the Bishop Motel and checked the motel records to ascertain what, if anything, was missing. According to the daily records, $219.40 in receipts had been received since the last deposit of money received for the rental of rooms. Bhartsang Jadeja did not find any money in the motel office. Also, no money was discovered on the body of the victim.

Charles Fernanders, an acquaintance of the defendant, testified that in late September or early October of 1982 he saw Merinda Graham with a wristwatch which was later identified as that of the victim. Other witnesses testified that Graham was the defendant's girl friend. Approximately a week later Fernanders saw the watch in the possession of the defendant. The defendant said that he wanted to pawn the watch. Fernanders rode with the defendant to a pawnshop in Mecklenburg County to attempt to sell the watch. The defendant was driving a blue Vega. The defendant was unsuccessful in selling the watch at the pawnshop. The defendant and Fernanders then drove to see James Ford who operated a garage in Mount Holly. Ford testified that the defendant offered to pawn the watch to him. When Ford replied that he was not interested in such a transaction but would consider buying it outright, the defendant offered to sell it to him. Ford bought the watch from the defendant for $5.00. At that time Ford asked the defendant if the watch was stolen. The defendant replied that the watch was not stolen and was his personal property.

[1] The defendant first contends that the trial court erred in denying his motion for the sequestration and individual *voir dire* of prospective jurors. The defendant argues that the presence of all the prospective jurors during the *voir dire* resulted in their exposure to the beliefs and prejudices of the other prospective jurors and kept them from candidly answering the *voir dire* questioning. He also contends that as a result of the collective *voir dire*, many jurors were able to observe other jurors being excused for cause due to their opposition to the death penalty and

were therefore able to frame their responses so as to achieve disqualification as well.

N.C.G.S. 15A-1214(j) provides: "In capital cases the trial judge for good cause shown may direct that jurors be selected one at a time, in which case each juror must first be passed by the State. These jurors may be sequestered before and after selection." This provision does not grant either party any absolute right. *See State v. Jackson*, 309 N.C. 26, 305 S.E. 2d 703 (1983). The decision whether to grant sequestration and individual *voir dire* of prospective jurors rests in the sound discretion of the trial court and its ruling will not be disturbed absent a showing of abuse of discretion. *Id.; State v. Johnson*, 298 N.C. 355, 259 S.E. 2d 752 (1979). The defendant's arguments that the collective *voir dire* made the prospective jurors aware of prejudicial matters and inhibited the candor of the jurors are the same arguments rejected as mere speculation in *Johnson*. The argument that a collective *voir dire* permits prospective jurors to become "educated" as to responses which would enable them to be excused from the panel is equally speculative. The defendant offered no proof and failed to show that the trial court's denial of his motion was an abuse of discretion. This assignment of error is overruled.

[2]  In his next assignment of error the defendant contends that he was prejudiced when the trial court ordered the Sheriff of Gaston County to randomly recruit jurors in the middle of the jury selection process. N.C.G.S. 9-11(a) provides in pertinent part: "If necessary, the court may, without using the jury list, order the sheriff to summon from day to day additional jurors to supplement the original venire." We have held that N.C.G.S. 9-11(a) clearly authorizes the trial court to order the summoning of supplemental jurors as a means to ensure orderly, uninterrupted and speedy trials. *State v. Fountain*, 282 N.C. 58, 191 S.E. 2d 674 (1972).

The defendant asserts that in this case, however, the trial court acted prematurely since other members of the regular jury pool were or would soon be available. This contention is without merit in light of the fact that the defendant failed to exhaust his peremptory challenges. The record indicates that at the time the trial court ordered the sheriff to summon additional jurors, only one juror remained to be seated and the defendant had two pe-

remptory challenges remaining. The twelfth juror seated was one of the supplemental jurors summoned by the sheriff. At the time he was accepted, however, the defendant still had one peremptory challenge remaining. The defendant has therefore failed to show any possible prejudice and may not now be heard to complain. *State v. Smith*, 291 N.C. 505, 231 S.E. 2d 663 (1977); *State v. Fountain*, 282 N.C. 58, 191 S.E. 2d 674 (1972).

[3] The defendant next contends that the trial court denied him the opportunity to "rehabilitate" jurors who had been challenged for cause by the State due to their opposition to the imposition of the death penalty. Prior to the trial the defendant filed a motion in which he sought to ask a series of specific questions to prospective jurors challenged on this basis. The line of questioning proposed by the defendant was as follows:

Mr. Juror:

You have been asked questions concerning your view about the death penalty and you have expressed your personal objections to the death penalty which are shared by many others.

I want to ask you some questions about a citizen's duty to serve as a juror. You know, do you not, that jury duty is an obligation and duty of citizenship which we all share?

You know, do you not . . . and I expect the Judge will so instruct the jury . . . that it is a citizen's duty as a juror to put aside what he thinks the law is or what he thinks the law should be and to take the law from the Judge and to render true verdicts according to the evidence?

You know also, do you not, that if the defendant is found guilty of murder in the first degree that the jury must decide what sentence should be imposed, whether the defendant will be sentenced to life imprisonment or to death in the gas chamber?

And you know that the law requires that a member of the jury is required by law to consider whether a penalty of death should be imposed?

And you and other jurors have already placed your hands on the Bible and sworn that you will apply the law.

And would you not try your very best to uphold that oath as a juror and as a citizen if you were called upon to do so?

And, Mr. Juror, if you were seated as a juror in this case, you would do your best to set aside your personal objections to the death penalty and, after hearing the evidence in the case and the instructions of the trial court, to follow your duty as a juror to fairly consider all the penalties which the law has provided?

And you could do that, could you not?

The defendant's motion to pose these questions to prospective jurors challenged for cause due to their opposition to the death penalty was denied. The defendant argues that the denial of the motion constituted prejudicial error in that he was denied access to a jury made up of a cross section of the community. This argument is without merit.

We have acknowledged that both the defendant and the State have the right to question prospective jurors as to their views concerning capital punishment in order to ensure a fair and impartial verdict. *State v. Adcock*, 310 N.C. 1, 310 S.E. 2d 587 (1984); *State v. Crowder*, 285 N.C. 42, 203 S.E. 2d 38 (1974), *death sentence vacated*, 428 U.S. 903 (1976). The trial court, however, is vested with broad discretion in controlling the extent and manner of such an inquiry and its decision will not be disturbed absent a showing of an abuse of that discretion. *State v. Adcock*, 310 N.C. 1, 310 S.E. 2d 587 (1984). The proposed questions were in the nature of comments by defense counsel concerning the obligations and duties of a citizen as a juror. In light of their content, the trial court did not abuse its discretion by denying the defendant's motion to pose them to prospective jurors challenged for their opposition to the death penalty. In reaching this conclusion we note that the trial court afforded the defendant an opportunity during the jury *voir dire* to question each of these prospective jurors as to whether they could, under any circumstances, vote to impose the death penalty.

[4] The defendant also appears to suggest that one or more of the jurors challenged for cause due to their opposition to capital punishment may have been improperly dismissed in violation of the standard established in *Witherspoon v. Illinois*, 391 U.S. 510

(1968). In the recent case of *Wainwright v. Witt*, --- U.S. ---, 105 S.Ct. 844, 83 L.Ed. 2d 841 (1985), the Supreme Court clarified *Witherspoon* and held that the proper standard for determining whether a prospective juror may be excluded for cause due to views concerning the death penalty "is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" --- U.S. at ---, 105 S.Ct. at 852, 83 L.Ed. 2d at 851-52 (1985), *quoting from Adams v. Texas*, 448 U.S. 38, 45 (1980). Under this standard it is clear in the present case that the prospective jurors challenged for cause due to their beliefs regarding capital punishment were properly dismissed. The record clearly indicates that all of the prospective jurors excused on this basis stated that they could not or would not vote to return a sentence of death under any circumstances.

In his next assignment of error the defendant argues that the trial court erred in denying his motion to suppress both the testimony of Mrs. Ruparib Jethwa identifying him at trial as one of the men who entered the Stonewall Motel on the night of the stabbing and evidence of her similar pretrial identification of him. He contends that all such evidence resulted from pretrial identification procedures which were so impermissibly suggestive that they created a substantial likelihood of misidentification. We disagree.

A *voir dire* hearing was held on the defendant's motion to suppress evidence of both types of identification. The trial court's findings based on substantial evidence elicited at the hearing were to the effect that on the night of September 16, 1982, two black males entered the Stonewall Motel and inquired about renting an apartment. Jethwa observed that one of the men was approximately six feet tall and light-complected, while the other was somewhat shorter and darker complected. Both were wearing blue jeans and T-shirts. Jethwa further testified that the lighting was bright inside the office. She stated that the two men were in the office for about two minutes, and during this period she observed a knife partially hidden in the pocket of the lighter complected individual. While she was observing the two men they were on the other side of a twenty-seven inch counter. Later that night she gave a description of these two men to Officer William Jonas who was investigating the stabbing of Probhatsing Jadeja.

Two days later Officer Jonas asked Jethwa to look through four albums of photographs in an attempt to identify the men who had come into the motel on the night of the stabbing. She was unable to identify anyone from the albums.

On January 4, 1983, Jonas had Jethwa look at a photographic line-up containing the photographs of six black males. At the time he showed her the line-up, Jonas instructed her to examine the photographs carefully and "determine whether or not she could identify the man who came into the Stonewall Motel the night that the murder occurred." She told Jonas that one of the photographs resembled the lighter complected individual who had entered the motel on the night in question. The photograph she identified was that of the defendant.

On February 21, 1983, Jethwa viewed a physical line-up consisting of six black males including the defendant. Jonas asked her to pick out the individual who came into the motel on the night in question with a knife. She identified the defendant as being that person. Following the rearrangement of the order of the six subjects, a second line-up was conducted. Jethwa again identified the defendant. Jethwa testified at the *voir dire* hearing that her in-court identification of the defendant at trial as being one of the two men who entered the motel on the evening of September 16, 1982 was based on her observations of him on the night in question.

The trial court concluded that while the pretrial identification procedures were "somewhat" tainted by Officer Jonas's comment that she should pick out the individual who came into the motel that night, the procedures were not so unnecessarily suggestive or conducive to irreparable mistaken identification as to constitute a due process violation. The court further found that Jethwa's in-court identification of the defendant as one of the men she saw at the motel on the evening of September 16, 1982 was based solely on her observations at that time and that it was not tainted by any unnecessarily suggestive pretrial identification procedure. The trial court then allowed evidence of both types of identification of the defendant by the witness Jethwa to be admitted.

[5] Identification evidence must be suppressed on due process grounds where the facts show that the pretrial identification pro-

cedure was so suggestive as to create a very substantial likeli-hood of irreparable misidentification. *Simmons v. United States*, 390 U.S. 377 (1968); *State v. Harris*, 308 N.C. 159, 301 S.E. 2d 91 (1983); *State v. White*, 307 N.C. 42, 296 S.E. 2d 267 (1982). The facts and circumstances of each case must be examined to deter-mine whether the pretrial identification procedure was so sug-gestive as to create a substantial likelihood of misidentification. *Simmons v. United States*, 390 U.S. 377 (1968); *State v. Harris*, 308 N.C. 159, 301 S.E. 2d 91 (1983). Furthermore, as stated by the Court in *Harris*, "Even though a pretrial identification procedure may be suggestive, it will be *impermissibly* suggestive only if all the circumstances indicate that the procedure resulted in a very substantial likelihood of irreparable misidentification." *State v. Harris*, 308 N.C. 159, 164, 301 S.E. 2d 91, 95 (1983) (emphasis original).

[6]    The factors to be examined to determine the likelihood of ir-reparable misidentification include: (1) the opportunity of the witness to view the individual at the time of the event; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the individual; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the event and the confrontation. *Neil v. Biggers*, 409 U.S. 188 (1972); *State v. Harris*, 308 N.C. 159, 301 S.E. 2d 91 (1983); *State v. Brady*, 299 N.C. 547, 264 S.E. 2d 66 (1980). Even in cases where the identification procedure has been suggestive, the court is to use these factors to determine whether under the "totality of the circumstances" the identification was reliable. *Neil v. Biggers*, 409 U.S. 188, 199 (1972); *State v. Brady*, 299 N.C. 547, 556, 264 S.E. 2d 66, 71 (1980).

[7]    We agree that the pretrial identification procedures were made suggestive by the officer's comments to Jethwa that she should point out the individual who was at the motel on the night in question, as they tended to convey the impression that he believed that person or his photograph was in each line-up. However, the trial court's findings and conclusions that the pretrial identification procedures did not create a substantial likelihood of misidentification and were not impermissibly sug-gestive were supported by substantial competent evidence and are binding on this Court. *State v. White*, 311 N.C. 238, 316 S.E. 2d 42 (1984); *State v. Daniels*, 300 N.C. 105, 265 S.E. 2d 217 (1980).

We also find adequate support for the trial court's ruling that the in-court identification was admissible as being of independent origin based solely upon Jethwa's observations at the scene of the crime. The factors to be considered in determining whether the in-court identification of a defendant is of independent origin are the same as those used to evaluate the likelihood of irreparable misidentification during pretrial identification procedures. *State v. Harris*, 308 N.C. 159, 301 S.E. 2d 91 (1983); *State v. Thompson*, 303 N.C. 169, 277 S.E. 2d 431 (1981). Applying these factors in light of all of the facts discussed earlier, we find more than adequate evidence in the record to support the trial court's holding that Jethwa's in-court identification was admissible as being of independent origin. This assignment of error is overruled.

The defendant's next assignment of error concerns certain portions of the testimony of prosecution witnesses Michael Campbell and Dawn Fullerton. Campbell testified that he had sold a watch to Probhatsing Jadeja. When asked when this transaction occurred, Campbell replied, "I gave it to him about a month before he got killed, I believe." Fullerton testified that she saw Jadeja lying in the parking lot covered with blood. When asked what she did after seeing him she responded, "I ran into the room where Jay (the victim) had been stabbed and got a set of keys." In both instances the defendant made an objection and moved to strike the testimony. The objections were overruled and the motions to strike denied. The defendant contends that the trial court committed error by allowing the witnesses to testify about their conclusions. Specifically he argues that Campbell's conclusion that Jadeja was "killed" invaded the province of the jury. Also he claims that Fullerton was not qualified to conclude that the acts complained of occurred in the room or that the victim was stabbed. We find these contentions to be meritless.

[8] We reject the assertion that Campbell's use of the word "killed" amounted to a prejudicial invasion of the province of the jury. At no point in Campbell's testimony was there any suggestion that the defendant killed Jadeja. *See State v. Corbett*, 307 N.C. 169, 267 S.E. 2d 553 (1982). The word "killed" did not infer whose actions were criminal or even that the victim died as the result of criminal conduct, and it did not relieve the State of the burden of proving that a crime had been committed and that

the defendant was the perpetrator. *See State v. Whitley*, 311 N.C. 656, 319 S.E. 2d 584 (1984).

[9]  As for Fullerton's testimony:

> This Court has long held that a witness may state the "instantaneous conclusions of the mind as to the appearance, condition, or mental or physical state of persons, animals, and things, derived from observation of a variety of facts presented to the senses at one and the same time." Such statements are usually referred to as shorthand statements of facts.

*State v. Spaulding*, 288 N.C. 397, 411, 219 S.E. 2d 178, 187 (1975), *death sentence vacated*, 428 U.S. 904 (1976). On the night in question, Fullerton heard someone say that Jadeja had been stabbed. She went outside and saw him lying in the parking lot covered with blood. She apparently overheard Jadeja say that he had been stabbed and robbed by three black males. She then ran to the motel office, which was blood-splattered and in disarray. From these circumstances we believe that the witness understandably arrived at the logical and instantaneous conclusion that Jadeja had been stabbed in the motel office. Her testimony to this effect was therefore admissible as a shorthand statement of fact. *See, e.g., State v. Marlow*, 310 N.C. 507, 313 S.E. 2d 532 (1984); *State v. Stinson*, 297 N.C. 168, 254 S.E. 2d 23 (1979).

The defendant next contends that the trial court erred in admitting over objection testimony from Robert Fullerton and Ralph Cohn that the victim stated that he had been stabbed by some black men. (Fullerton testified that Jadeja said there were three men; Cohn testified that Jadeja said there were two.) The defendant argues that this evidence was inadmissible hearsay. The State contends that under *State v. Vestal*, 278 N.C. 561, 180 S.E. 2d 755 (1971), *cert. denied*, 414 U.S. 874 (1973) and *State v. Alston*, 307 N.C. 321, 298 S.E. 2d 631 (1983), the testimony was admissible based on a showing that the testimony was necessary and that there was a reasonable probability of truthfulness surrounding the statements.

[10]  Even if it is assumed *arguendo* that the statements were not admissible under *Vestal* and *Alston*, this assignment of error is not properly before this Court. On redirect examination Cohn

testified without objection that the victim told him that he was stabbed by two black males. Where evidence is admitted without objection, the benefit of a prior objection to the same or similar evidence is lost, and the defendant is deemed to have waived his right to assign as error the prior admission of the evidence. *State v. Maccia*, 311 N.C. 222, 316 S.E. 2d 241 (1984); *State v. Chapman*, 294 N.C. 407, 241 S.E. 2d 667 (1978). We therefore overrule this assignment of error.

[11]  The defendant's next contention is that the trial court erred by allowing into evidence a certified copy of the title history of a 1975 Chevrolet Vega showing the defendant as the owner of the vehicle on September 16, 1982. He claims that the State failed to show that this document was relevant to the case and it should have been excluded. We disagree.

Any evidence calculated to throw any light upon the crime charged is admissible. *State v. Hunt*, 297 N.C. 258, 254 S.E. 2d 591 (1979); *State v. Knight*, 261 N.C. 17, 134 S.E. 2d 101 (1964). The State's evidence tended to show that a blue Vega was observed in the vicinity of the scene of the crime at the Bishop Motel at the approximate time of the stabbing. Earlier that day the defendant was seen driving a light blue Vega when he rented a room at the 321 Motel. Near the time of the stabbing the defendant and a companion inquired about renting a room at a motel located within a block of the Bishop Motel. A blue Vega was near the scene at about the time the victim was killed. Evidence that the defendant owned a Vega automobile was therefore highly relevant to the question of whether the defendant perpetrated the crimes. The evidence was not rendered inadmissible by the fact that the witness through whom the title certificate was introduced failed to testify that the vehicle identification or license tag number for the Vega in the certificate of title matched those of the Vega driven by the defendant or the one seen on the day of the crimes. The absence of such testimony would go to the weight to be given the evidence, not its admissibility. This assignment of error is overruled.

The defendant's next assignment of error concerns the testimony of the victim's brother, Bhartsang Jadeja, about certain records kept at the Bishop Motel. Jadeja testified that according to the motel records, $219.40 had been received since the last

bank deposit of rental receipts. He further testified that no money was discovered in the motel office or on the body of the victim. The defendant argues that the State failed to establish a sufficient foundation as to the authentication of these records to permit admission of Jadeja's testimony concerning them under the business records exception to the hearsay rule. He contends that this error was prejudicial due to the fact that Jadeja's testimony concerning the records created an inference that a robbery had occurred at the Bishop Motel which in turn permitted the court to charge the jury on first degree murder based on the felony-murder rule.

[12, 13] Business records made in the ordinary course of business at or near the time of the transaction involved are admissible as an exception to the hearsay rule if they are authenticated by a witness who is familiar with them and the system under which they are made. *State v. Wood*, 306 N.C. 510, 294 S.E. 2d 310 (1982); *State v. Galloway*, 304 N.C. 485, 284 S.E. 2d 509 (1981). The authenticity of such records may, however, be established by circumstantial evidence. *See State v. Davis*, 203 N.C. 13, 164 S.E. 737, *petition for reconsideration dismissed*, 203 N.C. 35, 164 S.E. 737, *cert. denied*, 287 U.S. 649 (1932). There is no requirement that the records be authenticated by the person who made them. *State v. Carr*, 21 N.C. App. 470, 204 S.E. 2d 892 (1974). *See State v. Franks*, 262 N.C. 94, 136 S.E. 2d 623 (1964). Furthermore, if the records themselves show that they were made at or near the time of the transaction in question, the authenticating witness need not testify from personal knowledge that they were made at that time. *State v. Carr*, 21 N.C. App. 470, 204 S.E. 2d 892 (1974).

[14] Although the witness did not explicitly testify that the records were made in the normal course of business and at or near the time of the transactions described therein, we conclude that Jadeja's testimony when coupled with the records themselves clearly establish these facts. Jadeja identified the documents as being the motel's daily records which indicated the number of rooms which had been rented and the amount of money received for each room. He further testified that these records were in the deceased's handwriting. The records showed daily entries for September 14, 15 and 16, and were therefore self-authenticating as to the time at which they were made. Additionally, we note that the witness testified that he operated his

own motel. This tended to show that the witness was familiar with general practices in the motel business regarding the recording of rentals and receipts received. The State laid an adequate foundation for the admission of both the records and Jadeja's testimony. This assignment of error is overruled.

[15] The defendant next contends that the trial court erred in failing to grant his motions to dismiss the charges against him. He argues that the State's evidence failed to show that the victim was killed during the commission of an armed robbery or that he was the perpetrator of the alleged offense.

Before the issue of a defendant's guilt may be submitted to the jury, the trial court must be satisfied that substantial evidence has been introduced tending to prove each essential element of the offense charged and that the defendant was the perpetrator. *State v. Hamlet*, 312 N.C. 162, 321 S.E. 2d 837 (1984); *State v. Powell*, 299 N.C. 95, 261 S.E. 2d 114 (1980). In considering a motion to dismiss, the trial court must examine the evidence in the light most favorable to the State, and the State is entitled to every reasonable intendment and inference to be drawn therefrom. *State v. Bright*, 301 N.C. 243, 271 S.E. 2d 368 (1980). Contradictions and discrepancies are for the jury to resolve and do not warrant dismissal. *State v. Hamlet*, 312 N.C. 162, 321 S.E. 2d 837 (1984). The test of whether the evidence is sufficient to withstand a motion to dismiss is whether a reasonable inference of the defendant's guilt may be drawn from the evidence, and the test is the same whether the evidence is circumstantial or direct. *State v. Lowery*, 309 N.C. 763, 309 S.E. 2d 232 (1983).

The evidence tended to show that at approximately noon on September 16, 1982, the defendant and his girl friend checked into a Charlotte motel. At that time he was observed driving a blue Vega. Sometime between 11:00 and 11:30 p.m. the defendant and another black male inquired about renting a room at the Stonewall Motel which was located about a block from the Bishop Motel. Shortly after 11:00 p.m. witnesses saw two black males in the vicinity of the Bishop Motel. One witness testified that she saw the men sitting in a blue Vega. Shortly after 11:00 p.m. the victim was discovered lying in the Bishop Motel parking lot covered with blood. He stated that two (or three) black men had stabbed and robbed him. When seen a few minutes earlier, the

victim was wearing a wristwatch. His watch was missing, however, when he was found lying in the parking lot. The motel office was discovered blood-splattered and in disarray. The receipts for the previous three days were missing. A vehicle title certificate indicated that on September 16, 1982, the defendant owned a 1975 Chevrolet Vega. Finally, in late September or early October 1982, the defendant's girl friend was seen in possession of a wristwatch which was later identified as belonging to the victim. Approximately a week later the defendant sold the watch to an acquaintance. This evidence was sufficient to support a reasonable inference that the victim was killed during the commission of a robbery and that the defendant perpetrated or aided in the perpetration of the robbery and killing.

[16] The defendant, however, strenuously argues that the trial court erred in permitting the prosecution to rely in part on his possession of the watch to link him to the crimes. Under the doctrine of possession of recently stolen goods, the possession of property recently after it is stolen, and under circumstances excluding the intervening agency of others, permits the inference that the possessor is the thief. This inference becomes weaker the more distant in time the possession is from the commission of the offense. *State v. Woods*, 311 N.C. 80, 316 S.E. 2d 229 (1984); *State v. Joyner*, 301 N.C. 18, 269 S.E. 2d 125 (1980); *State v. Patterson*, 78 N.C. 470 (1878). In order for the doctrine to be invoked, the State must prove beyond a reasonable doubt that: (1) the property is stolen; (2) it was found in the defendant's custody and subject to his control and disposition to the exclusion of others; and (3) the possession was recently after the unlawful taking. *State v. Woods*, 311 N.C. 80, 316 S.E. 2d 229 (1984); *State v. Maines*, 301 N.C. 669, 273 S.E. 2d 289 (1981).

The State clearly produced sufficient evidence that the watch was stolen from Jadeja. As for the second requirement of custody and control by the defendant, the watch was seen on the person of the defendant's girl friend two or three weeks after the crimes were committed. A week later the watch was seen in the hands of the defendant. The defendant contends that because of the intervening possession of the watch by his girl friend, the jury should not have been instructed on the doctrine of recent possession. We disagree.

It is not always necessary that the stolen property be actually in the hands of the defendant in order to trigger the inference that he is the thief. The doctrine is equally applicable where the stolen property is under the defendant's personal control. *State v. Lewis*, 281 N.C. 564, 189 S.E. 2d 216, *cert. denied*, 409 U.S. 1046 (1972); *State v. Foster*, 268 N.C. 480, 151 S.E. 2d 62 (1966). *See also State v. Harrington*, 176 N.C. 716, 96 S.E. 892 (1918). "In short, it may be in any place where it is manifest it must have been put by the act of the party or [with] his undoubted concurrence." *State v. Foster*, 268 N.C. at 487, 151 S.E. 2d at 67, *quoting State v. Johnson*, 60 N.C. 235, 237 (1864).

There was evidence in the present case tending to show that the defendant, his girl friend and their two children checked into the 321 Motel in Charlotte on the day the victim's watch disappeared when he was killed by two (or three) *males*. The watch was seen thereafter *only* in the hands of the girl friend or the defendant until it was sold by the defendant. Such evidence was sufficient to support a finding that, although the watch was at one point in the hands of the girl friend, it was in the defendant's custody and control at all pertinent times. *See, e.g., State v. Brown*, 76 N.C. 222 (1877) (doctrine applied in case involving defendant and wife); *State v. Johnson*, 60 N.C. 235 (1864) (same).

As for the final requirement that the possession be recently after the theft, the evidence showed that the girl friend had the watch approximately one to three weeks after the stabbing. The defendant was seen with it about a week later. In some cases we have held that the possession of stolen property more recently after the theft was not sufficiently recent to permit an inference of guilt under the doctrine of recent possession. *E.g., State v. Jones*, 227 N.C. 47, 40 S.E. 2d 458 (1946) (possession of a rooster sixteen to twenty days after alleged theft not sufficiently recent); *State v. Holbrook*, 223 N.C. 622, 27 S.E. 2d 725 (1943) (possession of tires eleven days after alleged theft). There is no specific period, however, beyond which possession can no longer be considered "recent." Rather, the term is a relative one and will depend on the circumstances of each case. *State v. Holbrook*, 223 N.C. 622, 27 S.E. 2d 725 (1943); *State v. Johnson*, 60 N.C. 235 (1864) (six weeks). In light of all of the other circumstances of this case, the possession of the watch by the defendant and his girl friend was sufficiently recent to support a reasonable inference of

the defendant's guilt under the doctrine of recent possession. This assignment of error is overruled.

[17]  The defendant next argues that because there was no direct evidence to show he was present when the crimes charged were committed, the trial court erred by instructing the jury on the concept of "acting in concert." The State's evidence, however, clearly tends to show that two or more men robbed and killed the victim. As discussed previously, there was also substantial evidence that the defendant was one of the perpetrators. This evidence was sufficient to support an instruction on the concept of acting in concert. *See State v. Woods*, 311 N.C. 80, 316 S.E. 2d 229 (1984). The defendant's argument to the contrary is without merit.

[18]  The defendant next contends that the trial court erred in submitting to the jury the charge of first degree murder based upon the theory of premeditation and deliberation. The defendant argues that there was no evidence which would allow the submission of first degree murder under that theory.

The State's evidence was sufficient to justify the submission to the jury of the first degree murder charge on the theory of premeditation and deliberation. However, assuming *arguendo* that the evidence was insufficient to support such an instruction, the defendant has failed to show any resulting prejudice. He was convicted of first degree murder specifically on the basis of the felony murder rule. The jury did not find that he committed the killing with premeditation and deliberation. Further, premeditation and deliberation are not elements of felony murder. *State v. Swift*, 290 N.C. 383, 226 S.E. 2d 652 (1976). Felony murder is murder in the first degree "irrespective of premeditation or deliberation or malice aforethought." *State v. Maynard*, 247 N.C. 462, 467, 101 S.E. 2d 340, 345 (1958). Even assuming the challenged instruction was error, the defendant has failed to show that it affected his first degree murder conviction which was based on the felony murder theory. This contention is without merit.

[19]  The defendant also contends that the State was required to elect the theory under which the first degree murder case would be submitted to the jury. We disagree. The State made out a *prima facie* case on both the theories of felony murder and premeditation and deliberation. When this occurs the State is not required to elect the theory under which the first degree murder

case will be submitted. *State v. Silhan*, 302 N.C. 223, 275 S.E. 2d 450 (1981). This assignment of error is overruled.

[20] The defendant next contends that the trial court erred in denying his motion to present both the opening and closing arguments at the penalty phase of the trial. This contention is without merit.

N.C.G.S. 15A-2000(a)(4) provides:

The State and the defendant or his counsel shall be permitted to present argument for or against sentence of death. The defendant or defendant's counsel shall have the right to the last argument.

While clearly providing the defendant with the opportunity to make the final argument at the penalty phase of the trial, neither this statutory provision nor any other gives a defendant the right to make both the first and last arguments. Furthermore, even had this been error the fact the defendant received a life sentence rather than the death penalty would have made the error harmless.

[21] The defendant's final argument is that the trial court erred in denying his motion to set aside the verdict as being against the greater weight of the evidence. The decision whether to grant or deny a motion to set aside the verdict is vested in the sound discretion of the trial court and is not reviewable absent a showing of an abuse of that discretion. *State v. McKenna*, 289 N.C. 668, 224 S.E. 2d 537, *modified*, 427 U.S. 912 (1976). A trial court may be reversed for an abuse of discretion only upon a showing that its ruling was so arbitrary that it could not have been the result of a reasoned decision. *White v. White*, 312 N.C. 770, 324 S.E. 2d 829 (1985). The evidence was sufficient to support the jury's verdict. We are therefore unable to discern any abuse of discretion by the trial court in denying the motion to set aside the verdict.

The defendant received a fair trial free from prejudicial error.

No error.