STATE v. CRAWLEY

[217 N.C. App. 509 (2011)]

━━━━━━━━

STATE OF NORTH CAROLINA v. SHANNON ELIZABETH CRAWLEY

No. COA11-93

(Filed 20 December 2011)

**1. Evidence—cell phone records—authentication—circumstantial evidence**

The trial court did not err in a first-degree murder case by admitting defendant's and an officer's cell phone records into evidence over defendant's objection based on alleged insufficient authentication. A witness's testimony, taken together with the circumstances, established sufficient circumstantial evidence to authenticate the documents, and any question of credibility was left to the jury.

**2. Appeal and Error—preservation of issues—failure to make motion to reopen case for rebuttal**

Although defendant contended that the trial court erred in a first-degree murder case by allowing the jury to review cell phone records and hear audiotapes during their deliberation without providing defendant an opportunity to present a rebuttal, defendant waived this argument. Defendant did not make a motion to reopen the case and did not explain what rebuttal would have been provided had the opportunity been given.

STATE v. CRAWLEY

[217 N.C. App. 509 (2011)]

Appeal by Defendant from judgment entered 22 February 2010 by Judge Ronald L. Stephens in Durham County Superior Court. Heard in the Court of Appeals 17 August 2011.

*Attorney General Roy Cooper, by Buren R. Shields, III, for the State.*

*Glover & Petersen, P.A., by Ann B. Petersen, for Defendant-appellant.*

HUNTER, JR., Robert N., Judge.

Shannon Elizabeth Crawley ("Defendant") appeals from a judgment entered upon a jury verdict finding her guilty of first-degree murder. We find no error.

## I. Factual & Procedural History

On 2 April 2007, the Durham County Grand Jury indicted Defendant for the murder of Denita Monique Smith. A jury trial began 8 February 2010 in Durham County Superior Court, the Honorable Judge Ronald Stephens presiding. The State's evidence at trial tended to show the following.

At approximately 8:10 a.m. on 4 January 2007, Michael Hedgepeth, the maintenance director for the Campus Crossings Apartments in Durham ("Campus Crossings"), heard a shot fired and saw a woman running from the back to the front of the 1100 building of the complex. Mr. Hedgepeth testified that the woman's route was an unusual one because there was a more convenient exit to the parking lot. As Mr. Hedgepeth drove toward the 1100 building, he saw a young woman, possibly the same woman as before, driving away from the building in a burgundy SUV. Mr. Hedgepeth testified the young woman was hysterical about the gunshot; she told him it was because she was afraid of guns. The young woman told Mr. Hedgepeth she stayed at the 1200 building, so he told her to go wait for him there while he called the police.

Mr. Hedgepeth saw the young woman in the SUV once more in the parking lot of Campus Crossings while he was on the phone with police but did not see her after that. Police arrived at Campus Crossings in response to Mr. Hedgepeth's 911 call, but they left without filing a report because they were unable to ascertain the source of the gunshot.

At approximately 10:00 a.m. that morning, Corey Smith,[1] a Campus Crossings resident, was coming out of his apartment to go to work when he saw someone's belongings scattered down the staircase. At first, he thought someone did not make it up the stairs for some reason, but at the bottom of the stairs, he discovered a body. After seeing that the body was not breathing, Mr. Smith called 911 on his cell phone. Based on instructions from the 911 operator, he checked a purse on the stairs for identification and found out it was the body of Denita Smith, a Campus Crossings resident and student pursuing a master's degree at North Carolina Central University. Mr. Smith then went to the clubhouse at Campus Crossings to notify Mr. Hedgepeth.

Corolla Lauck, a paramedic and one of the first people at the scene, determined at her arrival that Ms. Smith was already dead. Once police arrived, Mr. Hedgepeth gave investigators a description of the woman he saw earlier that morning. Mr. Hedgepeth described the woman as a black female, 5'10", with a ponytail, who was driving a burgundy SUV.

Edith Crawley-Kearns,[2] Ms. Smith's best friend, received a phone call from her brother who lived at Campus Crossings asking whether she had heard from Ms. Smith, since he knew something was going on at the complex. After trying to call Ms. Smith without getting an answer, Ms. Crawley-Kearns called Jermeir Stroud ("Officer Stroud"), Ms. Smith's fiancé. Officer Stroud was a Greensboro police officer and had been engaged to Ms. Smith since November 2006. Officer Stroud told Ms. Crawley-Kearns that he had heard something was going on at Campus Crossings and that he was on his way to Durham since he had not heard from Ms. Smith. Upon his arrival at the scene, Officer Stroud was told of Ms. Smith's death, and, after providing his information to investigators, he spent the rest of the day with his family and Ms. Smith's family.

The next day, Officer Stroud found out that police were looking for someone with a red Ford Explorer in connection with the murder. Officer Stroud had been in a romantic relationship with Defendant in 2004-2005 and knew that she drove a red Ford Explorer. Officer Stroud called Jack Cates of the Durham Police Department, who asked him to return to Durham to speak with investigators. Officer Stroud told Investigator Shawn Pate about Defendant, and

---

1. Mr. Smith is not related to Denita Smith.

2. Ms. Crawley-Kearns is not related to Defendant.

Investigator Pate headed to Greensboro, where Defendant worked, to meet with Defendant.

On 5 January 2007, Defendant told Investigator Pate that she did not know Ms. Smith and had only seen her once two weeks prior in church and in pictures at Officer Stroud's house. She stated that on the morning of 4 January 2007, she was late to work because she took her child to a doctor's appointment. She told Investigator Pate that she had never owned a gun or had a gun.

Five months later, however, on 30 May 2007, Defendant told Investigator Pate that she wanted to talk about what happened on 4 January 2007. She said that on 3 January 2007, she came home and found Officer Stroud in her bedroom. He indicated that he had a weapon and that she should be quiet. He then drove her to Durham to Campus Crossings. They then drove back to Greensboro, and Officer Stroud left. Defendant said that on 4 January 2007, the same thing happened and that Officer Stroud threatened to harm her children if she would not come with him. When they got to Campus Crossings, Officer Stroud got out of the vehicle. Defendant heard arguing and got out of the vehicle. She was about three or four feet in front of the vehicle when she heard a gunshot. Officer Stroud came back to the vehicle and got into the driver's seat. Defendant tried to get in the passenger seat behind the driver, but the back seat was locked, so Officer Stroud jumped into the back from the driver's seat, and Defendant got into the driver's seat. Defendant said it was then that she ran into Mr. Hedgepeth and that Mr. Hedgepeth could not see Officer Stroud because he was crouched in the back of the vehicle. Defendant was later charged with first-degree murder.

On 20 June 2008, while out on bond, Defendant told Charlotte law enforcement that Officer Stroud came to Charlotte and raped her between 2:30 and 5:30 a.m. Defendant alleged that Officer Stroud had cut her clothes off of her with a knife, held a knife to her throat, cut her thigh, penetrated her vagina with the knife, and ejaculated.

Pamela Zinkann, a detective in the sexual assault unit of the Charlotte/Mecklenburg Police Department, testified that based on the alleged time of the rape and Officer Stroud's cell phone records, Officer Stroud would have had to travel from Charlotte to Greensboro at approximately 120 miles per hour without stopping for red lights to have committed the rape. A rape kit was analyzed, and the results were negative for semen. There were lacerations to Defendant's neck and thigh, as well as abrasions to the outer labia. However,

despite Defendant's contentions to Detective Zinkann that she needed stitches and had been penetrated by a knife, both a nurse and a physician's assistant testified that there were no injuries requiring stitches and that there were no injuries to the vaginal canal.

On 21 June 2008, Defendant suggested to Detective Zinkann that law enforcement search Officer Stroud's trash can at his residence to look for the knife. On or about 23 June 2008, Officer Stroud put trash in his trash can for the first time since the alleged rape. At the bottom of his otherwise empty trash can, he saw a knife. Officer Stroud called the Greensboro Police Department about the knife. Brandon Inscore, one of Officer Stroud's neighbors, told Detective Zinkann that he heard a thump and saw a vehicle drive away from Officer Stroud's trash can on 19 June 2008. Another neighbor, Jessica Hopkins, told Detective Zinkann that on 19 June 2008, she saw someone throw something into Officer Stroud's trash can and drive off. Evidence of this incident was introduced at trial but is not at issue on appeal.

Dr. Cynthia Gardner, a forensic pathologist, testified at trial that Ms. Smith was killed by a distant range gunshot wound to the head. During the autopsy, Dr. Gardner recovered a bullet from Ms. Smith's body. Agent Scott Jones, a forensic firearms analyst at the State Bureau of Investigation ("SBI"), examined the bullet. Using factors such as size, shape, and rifling characteristics, Agent Jones determined that the bullet most likely came from a revolver and that its caliber was in the .38 family. A search of the FBI general rifling characteristics database revealed eight possible firearms which could have fired the shot, including a Taurus.

Ronald Simpson, Defendant's co-worker, testified that he sold Defendant a .38 Taurus Special revolver in October 2006 in the parking lot of the 911 Center where they worked. Defendant testified that she had disposed of the gun shortly after receiving it by throwing the gun in one dumpster and the ammunition in another dumpster. Officer Stroud testified that the only two weapons he owned were a .40 caliber Sig Sauer he carries while on duty and a .40 caliber Glock 23 model pistol he carries while off duty. Agent Jones testified that a .40 caliber weapon is not designed to fire a .38 caliber bullet and that he was not sure whether it was possible for a .38 caliber bullet to be fired from a .40 caliber weapon. Michael Gurdziel, a forensic chemist at the SBI, testified that an analysis of a lift taken from the driver's seat of Defendant's vehicle tested positive for gunshot residue.

STATE v. CRAWLEY

[217 N.C. App. 509 (2011)]

During the trial, the State called Ryan Harger, a custodian of records for Sprint/Nextel, a telecommunications company which transmitted electronically recorded cell phone records to the Durham Police Department during its investigation. Over objection, Mr. Harger indicated that the records which were transmitted to the police included the date and time of a call, the numbers called, the length of the call, and the cell phone towers that were used to make or receive the call. At the trial, a screen was set up and Mr. Harger was asked if he recognized information on the screen as being the same information sent from Sprint/Nextel to the Durham police. Mr. Harger then identified a screen print that contained subscriber information for the accounts of Defendant and Officer Stroud. The subscriber history for Defendant was identified for the date Ms. Smith was killed and the date Defendant alleged she was assaulted by Officer Stroud. Next, Mr. Harger identified a cell site list that contained the latitude and longitude of each tower site. Mr. Harger then explained how a cell phone transmits its signals from a cell phone to a cell tower to another telephone. Each cell tower is given an urban area network code to identify the urban area in which the cell phone tower is located. In addition, each cell tower has one, two, or three sets of antennas which can be directed to an area within the cell phone tower's coverage area to better facilitate calls from certain geographic areas. Mr. Harger identified the call record, which has columns containing, *inter alia*, the following information: the telephone number making and receiving the call, the date of the call, the time the call began, the duration of the call in seconds, whether the call is inbound or outbound, any 911 calls made, and the phone receiving the call. Additional columns contain the cell site which received the cell signal when the call was originated and terminated, including the local site name and the number of the switch on the tower which received the call.

The State then had Mr. Harger examine the computer records on the screen for Defendant's and Officer Stroud's cell phones for the time period in which the killing took place. Afterwards, Mr. Harger was handed a CD which contained the Sprint/Nextel records shown on the computer screen. He then verified the information between the computer screen records and the records on the CD to be the same. Based on this testimony, the State then introduced the CD as Exhibit 120.

On cross-examination, Defendant elicited the fact that Mr. Harger did not create the CD himself and could not confirm the accuracy of

the information in the exhibit, but only that he believed it to be accurate. On redirect, the State asked if he believed the records to be accurate, to which he answered that he did believe they were accurate.

The State then called Durham Police Detective Chappell, who was assigned by the investigation department to "extrapolate" cell phone calls with cell tower locations to determine when and where a cell phone call was made or received. Based upon the electronic records received from Sprint/Nextel, Detective Chappell plotted the information on a map. This information was made into an exhibit and introduced as part of Exhibit 121. This exhibit was created in part by copying and pasting sections of the Nextel records into the chart created by Detective Chappell. These calls and the towers which received them were then geographically put on a map for the dates of the death and alleged assault. A separate color point was used to locate the cell phone numbers for Defendant and Officer Stroud.

The effect of the summary of the cell phone records was to demonstrate to the jury that on the day before the killing of the decedent, Defendant's cell phone was making cell phone calls from Durham near the Campus Crossing Apartments. All of the calls made that day from Officer Stroud's cell phone were relayed through towers located around Greensboro.

On 22 February 2010, the jury found Defendant guilty of first-degree murder. Defendant was sentenced to life imprisonment without the possibility of parole. On 23 February 2010, Defendant timely filed written notice of appeal to this Court.

## II. Jurisdiction & Standard of Review

Defendant appeals from a final judgment in superior court where she was convicted of a non-capital offense. Therefore, we have jurisdiction over her appeal pursuant to N.C. Gen. Stat. § 7A-27(b) (2009).

A trial court's determination as to whether a document has been sufficiently authenticated is reviewed de novo on appeal as a question of law. *State v. Owen*, 130 N.C. App. 505, 510, 503 S.E.2d 426, 430, *disc. review denied*, 349 N.C. 372, 525 S.E.2d 188 (1998).

## III. Analysis

[1] Defendant first contends the trial court erred by admitting Defendant and Officer Stroud's cell phone records into evidence over Defendant's objection for insufficient authentication. We disagree.

Rule 901 of our Rules of Civil Procedure requires authentication or identification "by evidence sufficient to support a finding that the matter in question is what its proponent claims." N.C. Gen. Stat. § 8C-1, Rule 901 (2009). Rule 901 does not require the proponent of evidence to conclusively prove that tendered documents or electronic evidence is definitively a record, only that the evidence is relevant for the jury to conclude that it is authentic. Our Supreme Court "has held that '[t]he competency, admissibility, and sufficiency of the evidence is a matter for the court to determine. The credibility, probative force, and weight is a matter for the jury.' " *State v. Wiggins*, 334 N.C. 18, 34, 431 S.E.2d 755, 764 (1993) (citation omitted). In *Wiggins*, the Court stated, "It was not error for the trial court to admit the [evidence] if it could reasonably determine that there was sufficient evidence to support a finding that 'the matter in question is what its proponent claims.' " *Id.* (quoting N.C. Gen. Stat. § 8C-1, Rule 901). The Court then explained that Defendant would be "free to introduce any competent evidence relevant to the weight or credibility of [the witness's] testimony." *Id.* (citing N.C. Gen. Stat. § 8C-1, Rule 104(e)).

Business records stored electronically are admissible if

> (1) the computerized entries were made in the regular course of business, (2) at or near the time of the transaction involved, and (3) a proper foundation for such evidence is laid by testimony of a witness who is familiar with the computerized records and the methods under which they were made so as to satisfy the court that the methods, the sources of information, and the time of preparation render such evidence trustworthy.

*State v. Springer*, 283 N.C. 627, 636, 197 S.E.2d 530, 536 (1973). The authenticity of such records may be established by circumstantial evidence. *State v. Wilson*, 313 N.C. 516, 533, 330 S.E.2d 450, 462 (1985). "There is no requirement that the records be authenticated by the person who made them." *Id.* If the records themselves show they were made at or near the time of the transaction, the witness does not need to testify from personal knowledge that they were made at that time. *Id.*

Defendant argues the cell phone records were not properly authenticated because defense counsel's cross examination of Mr. Harger revealed that Mr. Harger himself did not provide the records to the police and that he could not know for certain if a particular document was, in fact, from Sprint/Nextel. However, Mr. Harger's testimony, taken together with the circumstances, establishes sufficient

circumstantial evidence to authenticate the documents, and any question of credibility is left to the jury. Mr. Harger, a custodian of records for Sprint/Nextel for 10 years, testified that he is familiar with Sprint/Nextel records and that he has testified in other cases. He stated that Sprint/Nextel transmitted records to the Durham Police Department and that he believed it was by e-mail. He testified that the records were kept in the normal course of business and that the documents he saw were the same as those normally sent to law enforcement in connection with a case.

According to Mr. Harger's testimony, Exhibit 120 included a response letter from Sprint, a screen print of Sprint's database, a directory of cell sites, and call detail records. Although Mr. Harger did not send the documents to the Durham Police Department, he testified that he believed them to be accurate and that he was familiar with each type of document. This was sufficient evidence to show that the records were, as the State claimed, records from Sprint/Nextel, and any question as to the accuracy or reliability of such records is a jury question.

Assuming, *arguendo*, Mr. Harger's testimony did not authenticate the records, this error was not prejudicial, as Detective Chappell's testimony sufficiently authenticated Exhibit 121, which also contained Sprint/Nextel phone records for Defendant and Officer Stroud. *See State v. Ferguson*, 145 N.C. App. 302, 307, 549 S.E.2d 889, 893 (2001) ("Evidentiary errors are harmless unless a defendant proves that absent the error a different result would have been reached at trial."). Detective Chappell testified that he received the records from Sprint/Nextel pursuant to a court order in this matter and that they were the same records that Mr. Harger testified to. Detective Chappell then testified as to how he mapped out the relative locations of Defendant and Officer Stroud based on the cell phone records provided by Sprint/Nextel.

Under Rule 901, "[t]estimony of [a] [w]itness with [k]nowledge" sufficiently conforms to the methods of authentication and identification provided for under the Rule. N.C. R. Evid. § 8C-1, Rule 901(b)(1) (2009). Detective Chappell's testimony as to the same records as Mr. Harger sufficiently satisfied the "witness with knowledge" standard provided for under Rule 901(b). *Id.* Because Detective Chappell's testimony authenticated the phone records, any possible error in admitting the records during Mr. Harger's testimony was not prejudicial.

STATE v. CRAWLEY

[217 N.C. App. 509 (2011)]

**[2]** Defendant also alleges that the trial court erred by allowing the jury to review cell phone records and hear audiotapes during their deliberation because they contained material not put before the jury during the presentation of evidence, which Defendant did not have the opportunity to address with rebuttal evidence or in closing argument. We find Defendant has waived this argument.

During jury deliberations, the jury asked to review the evidence, including the cell phone records and audio tapes of Defendant's phone conversations with Officer Stroud. Defense counsel objected to the cell phone records, asking that the court

> limit the jury's consideration of all the information on those CDs that was not the subject of a direct—or question or cross-examination question under oath, on the grounds that there was a lot of information that was not provided to the jury in the State's case.

> And it would be improper now to enter that evidence without—after the case is the over and after the State has rested. I do understand that the CDs themselves were admitted under evidence and that that was done through a witness under oath. And I would do my objections on the grounds that at the time that there was no proper foundation for that person to enter those records. But you've already ruled on that as well. So that's what I wanted to put on record.

Defense counsel also objected to the audio tapes, stating that "everything after the first call on that tape was not played to the jury during the trial."

Defense counsel later clarified his exception, stating,

> Because there are substantially new materials that I did not have the opportunity to address in my closing argument. The other of those calls on there, as you may know, these tapes were handed over to her attorneys who it sounds like, I don't know, there were some mixed—the way some started and the way some stopped. She was not asked about those or had the opportunity to address those on direct or on cross or redirect. And I was not—did not have an opportunity to address the Court—the jury about. Especially all the new material we have heard in these tapes regarding, you know, this meeting and why didn't you show up and why didn't you—was there someone in the car, you know, there wasn't. And all of that, the

jury's hearing for the first time. And the State's evidence is closed. And none of that was authenticated or foundation laid. And I didn't have the opportunity to address it in closing.

And I think it violates her Sixth Amendment right to counsel to now have stuff played for the jury that was not put in the State's evidence and published to—and they ·had the opportunity to publish that entire tape during the case—State's case. And she—they were asked, is there anything else you want to show to the jury. And it's not until we've closed and it's done that they're now hearing about it. And I was—move for a mistrial.

Defendant argues that it was error for the trial court to permit the jury to hear this evidence without providing Defendant an opportunity to present a rebuttal. Defendant, however, did not make a motion to reopen the case and did not explain what rebuttal would have been provided if the opportunity was given.[3] Absent a motion to reopen the case, we cannot rule on the trial court's failure to allow an opportunity for rebuttal. *See* N.C. R. App. P. 10(a)(1) (requiring a party to make a request, objection, or motion at the trial and obtain a ruling upon that request, objection, or motion to preserve it for appellate review). This argument has been waived.

## IV. Conclusion

For the foregoing reasons we find

No error.

Judges HUNTER, Robert C., and STROUD concur.

---

3. Defendant cites to *State v. Thompson*, 19 N.C. App. 693, 200 S.E.2d 208 (1973) in her argument. In *Thompson*, however, the defendant requested permission to recall a witness and that request was denied. *Id.* at 695, 200 S.E.2d at 210. Here, we have no such request to introduce evidence or reopen the case.