IN THE COURT OF APPEALS OF NORTH CAROLINA

 2022-NCCOA-3
 No. COA21-379

 Filed 4 January 2022

 Surry County, No. 20 JA 124

 IN THE MATTER OF: K.H.

 Appeal by Respondents from orders entered 26 and 29 April 2021 by Judge

 Spencer G. Key, Jr., in Surry County District Court. Heard in the Court of Appeals

 1 December 2021.

 Susan Curtis Campbell for Petitioner-Appellee Surry County Department of
 Social Services.

 James N. Freeman, Jr., for Appellee Guardian ad Litem.

 Stam Law Firm, PLLC, by R. Daniel Gibson, for Respondent-Appellant Mother.

 Anné C. Wright for Respondent-Appellant Father.

 COLLINS, Judge.

¶1 Respondent-Father and Respondent-Mother appeal from orders adjudicating

 their son, Ken, a neglected juvenile and maintaining his custody with the department

 of social services.1 Because the trial court’s findings of fact support its conclusion

 that Ken was a neglected juvenile and the trial court did not abuse its discretion with

 respect to disposition, we affirm.

 1 Various imperfections in the notices of appeal, none of which the parties raise, are

 not jurisdictional defects.
 IN RE K.H.

 2022-NCCOA-3

 Opinion of the Court

 I. Background

¶2 On 15 September 2020, Petitioner Surry County Department of Social Services

 (“SCDSS”) received a report “alleging substance use by the Respondents which was

 impacting their care of” Ken, as well as “an injurious environment impacting [Ken’s]

 safety.” On 24 September 2020, SCDSS filed a juvenile petition alleging that Ken

 was neglected. The trial court held adjudication and disposition hearings on 25 and

 26 March 2021.

¶3 At the adjudication hearing, Petitioner presented testimony from Audrey

 Huston, a SCDSS social worker; Jonathan Young, a paramedic with Surry County

 Emergency Services; officer Jody Beketov of the Mount Airy Police Department; and

 Michael Barnes, president and owner of Unique Background Solutions (“UBS”).

 Beketov testified that when she first came to Respondents’ residence on 26 February

 2020 to investigate possible stolen property, she observed Mother taking Ken to a

 neighbor’s house. Beketov searched the Respondents’ residence with Mother’s

 consent and found “a burnt spoon and a used syringe” in the bathroom trash can and

 “a clear plastic baggy that had a crystal-like substance inside” under the toilet seat.

 Over objection, Beketov testified that she identified pills in the plastic bag as

 alprazolam based on visual inspection and identified other substances in the bag as

 methamphetamine and fentanyl based on field tests. Beketov also found “several

 paraphernalia items located throughout the residence,” but could not specifically
 IN RE K.H.

 2022-NCCOA-3

 Opinion of the Court

 recall what they were. Beketov twice went to Respondents’ residence when Ken’s

 paternal grandmother overdosed and required EMS attention on 30 July and

 16 September 2020.

¶4 Barnes testified that UBS was the collection agency contracted with SCDSS to

 provide drug screens. Barnes had “[j]ust over 15 years” of experience with UBS

 collecting both hair and urine specimens, was a “qualified train the trainer under

 Department of Transportation qualifications”; received training from Omega

 Laboratories, the lab where UBS submitted its hair follicle specimens; and was “DOT

 qualified” for 12 years.

¶5 Barnes explained UBS’ process for collecting, securing, and submitting hair

 and urine specimens for drug testing as follows: The individual undergoing testing

 gives a specimen at a UBS facility. For urine specimens, UBS conducts an instant

 test. If the instant test gives a non-negative result, UBS sends the specimen to a

 laboratory for confirmatory testing. For hair specimens, Omega Laboratories

 measures the specimen, “run[s] it through a wash . . . to remove any environmental

 contaminants,” performs an immunoassay screening, and “if there are non-negatives

 presented in the screen, it is then passed onto the confirmation” with gas

 chromatography mass spectrometry. Once the tests are complete, a laboratory report

 is generated and passed onto “a medical review officer who is separate from the lab.”

 The medical review officer’s responsibility is to communicate with the specimen donor
 IN RE K.H.

 2022-NCCOA-3

 Opinion of the Court

 and determine whether any valid prescriptions explain a positive test result.

¶6 According to Barnes, a specimen of Ken’s hair was collected at a UBS facility

 on 16 September 2020 and sent for analysis at Omega Laboratories. Counsel for each

 Respondent objected to the admission of the results of Ken’s tests. Following

 argument, the trial court concluded that Barnes “qualifies as an expert at least in the

 area of understanding how tests are performed, not actually doing the performing of

 them and examining, but certainly analyzing. He’s able in his capacity to analyze

 the data he receives from a lab[.]”

¶7 The trial court admitted the reports containing the results of Mother, Father,

 and Kens’ drug screens. The trial court permitted Barnes to testify that Ken’s test

 was positive for marijuana, methamphetamines, 6-AM heroin, and morphine. The

 trial court likewise permitted Barnes to testify, again over objection, that a urine

 sample from Mother was positive for fentanyl, norfentanyl, morphine, and tramadol;

 and a urine sample from Father was positive for marijuana, fentanyl, norfentanyl,

 morphine, and tramadol.

¶8 On 26 April 2021, the trial court entered an order adjudicating Ken a neglected

 juvenile (“Adjudication Order”). The Adjudication Order included the following

 pertinent findings of fact:

 7. During [SCDSS’s] assessment of the report, the
 Department found the juvenile to be 10 months of age,
 crawling, and pulling up.
 IN RE K.H.

 2022-NCCOA-3

 Opinion of the Court

8. The Respondents admitted to previous substance use,
including intravenous heroin use, but claimed they had
been clean for several weeks. The Respondents admitted
that they were both getting subutex or suboxone off the
streets.

9. The Respondents entered into a Safety Plan with the
Department that the child would have a safe, sober
caretaker at all times, and the child would have no access
to drug paraphernalia.

10. During the ensuing investigation of the report, the
Social Worker learned that the Respondent Mother had
been found in possession of Schedule I, II, and IV controlled
substances, drug paraphernalia, including a burnt spoon
and used needle, and stolen property, on or about February
26, 2020, after a search of the home was conducted.

11. Additionally, it was determined by the Department
that an overdose had occurred in the home during July
2020.

13. [sic] On 9/16/2020, the Respondent Parents submitted
to urine drug screens and the instant test results showed
the father positive for marijuana, tramadol,
benzodiazepine, and fentanyl; the mother’s instant screen
was positive for fentanyl and tramadol.

14. On 9/16/2020, a hair drug screen was completed on the
juvenile, and on 9/24/2020, the test results indicated the
child was positive for marijuana, methamphetamine,
opiates, morphine, and 6-am (heroin).

15. On 9/24/2020, the Respondent Parents’ confirmed drug
screen results indicated that the father was positive for
tramadol, opiates, morphine, marijuana, fentanyl, and
norfentanyl, and the mother was positive for fentanyl,
norfentanyl, opiates, morphine, and tramadol;
additionally, on 9/16/2020, the Social Worker located a
used needle in the front yard, close to the front door of the
 IN RE K.H.

 2022-NCCOA-3

 Opinion of the Court

home.

16. Officer Beketov with the Mount Airy Police Department
conducted the search of the home on or about 2/26/2020,
and did find and confiscate controlled substances,
paraphernalia, and stolen property in the home for which
Juvenile Petitions were filed against the Respondent
Mother in Juvenile Court due to the mother’s minority at
the time.

17. Officer Beketov also testified that just prior to her
search of the home, the officer observed the Respondent
Mother taking the juvenile to the next-door neighbor’s
home, and as Officer Beketov was leaving the residence,
following the search and confiscation of the substances,
paraphernalia, and stolen property, the mother retrieved
the child from the neighbor.

18. Jonathan Young, Surry County EMS Paramedic,
testified that he was dispatched to the home of the
Respondent Parents and juvenile on July 30, 2020, due to
an unconscious female in the home, and when he arrived,
two individuals were performing CPR on the woman.

19. Mr. Young testified that four cans of Narcan were used
to revive the unconscious and unresponsive woman, and
after she became conscious, the woman identified herself
as Jana Torres and she admitted to taking heroin.

20. During her testimony, Officer Beketov corroborated
the testimony of Jon[a]than Young as she had also
responded to the home . . . on July 30, 2020 and had
observed the events there as well.

21. Officer Beketov spoke with the Respondent Father
about what had occurred in the home on 7/30/2020, and
both he and the paternal uncle, Bryson, provided
information to police and EMS, indicating that the woman
that was receiving emergency services was their mother,
Jana Torres, and that their mother uses
 IN RE K.H.

 2022-NCCOA-3

 Opinion of the Court

methamphetamine and heroin, but neither knew what
substance she had consumed that day.

22. Officer Beketov also testified that Jana Torres
overdosed, again, in the home of the Respondents and
juvenile, on 9/16/2020, and that Ms. Torres again admitted
overdosing on heroin.

23. The Respondent Parents, when asked by the
Department about any persons providing care for the
juvenile other than themselves, did not provide any
information about the child being out of the parents’ care
for any length of time.

24. On 9/30/2020, the Respondent Mother admitted to the
Department that both she and the Respondent Father
needed to go to the Crisis Recovery Center in Statesville,
for detox treatment.

25. Michael Barnes testified regarding the process and
procedures used for collecting and testing specimens for
urine and hair drug screens.

26. Mr. Barnes provided a detailed description of the care
and safeguards used in collecting drug screen specimens,
and the steps employed each time a specimen is provided
to avoid contamination, misidentification, and to protect
the chain of custody of the specimen to the outside
laboratory.

27. Mr. Barnes has been in the field of drug testing for
more than 15 years, and through experience and
continuing training and education, has become a trainer in
the field.

28. While Mr. Barnes was unable to provide an exact
description of the science of the method employed in the
laboratory testing of the specimens Unique Background
Solutions sends to the outside laboratories, he did expand
on his duty to the Department and other contracting
 IN RE K.H.

 2022-NCCOA-3

 Opinion of the Court

entities to ensure the techniques, accuracy, and protocols
inherent in reliable drug testing.

29. Mr. Barnes also testified that Unique Background
Solutions contracts with outside laboratories, Quest
Diagnostics and Omega Laboratories, because both labs
are leaders in the industry for being accurate and reliable.

30. Further, Mr. Barnes testified that the method used by
Omega Laboratories in testing hair specimens employs a
chemical wash to eliminate all outside contaminates before
the inside of the hair shaft is tested using Gas
Chromatography/Mass Spectrometry (“GC/MS”).

31. GCMS is considered to be the criterion standard for
confirmatory testing, and has been widely used in the
science of forensics such as arson investigations,
employment drug testing, used to deny unemployment
benefits, probation and parole matters, arbitrations, child
custody, random drug testing, and is currently defined as
the standard for confirmatory drug screening in the NC
Medicaid Drug Testing for Opioid Treatment and
Controlled Substance Monitoring . . . .

32. GC/MS screening detects a drug metabolite produced
by the body.

33. With the exception of marijuana metabolites, which
the Respondent Father tested positive for, the Respondents
tested positive for the same substances.

34. The juvenile’s hair specimen was approximate 1.5
inches in length, and according to Mr. Barnes, hair grows
at an average of 1/2 inch per month, and therefore, a hair
drug screen provides a window of approximately 90 days
back in time for detecting illicit substances.

35. Mr. Barnes also testified that heroin metabolizes
quickly in the body to the first metabolite, 6-AM, and then
again, to morphine.
 IN RE K.H.

 2022-NCCOA-3

 Opinion of the Court

 36. The Court found the evidence of the Respondents’ and
 juvenile’s drug screens proffered by the Department to be
 reliable and accurate.

¶9 Upon the Adjudication Order, the trial court entered a Juvenile Disposition

 Order on 26 April 2021 (“Initial Disposition Order”). The trial court maintained legal

 and physical custody of Ken with SCDSS, directed that Ken remain in his current

 relative placement, maintained reunification as the permanent plan, and granted

 both parents “a minimum of once weekly visitations, for two hours, supervised.”

¶ 10 On 29 April 2021, the trial court entered an Amended Juvenile Disposition

 Order (“Amended Disposition Order”) which contained the same custody and

 visitation provisions as the Initial Disposition Order, but included additional findings

 of fact.

¶ 11 Both Mother and Father noticed appeal.

 II. Discussion

 A. Adjudication of Neglect

¶ 12 Respondents challenge many of the trial court’s adjudicatory findings of fact

 concerning the drug test results, the presence of controlled substances in the home,

 and the presence of stolen property in the home. Respondents argue that these

 findings are based on erroneously admitted evidence and are otherwise unsupported,

 and that the remaining findings of fact do not support the trial court’s conclusion of

 law that Ken was neglected.
 IN RE K.H.

 2022-NCCOA-3

 Opinion of the Court

¶ 13 We review an adjudication of abuse, neglect, or dependency to determine

 whether the trial court’s findings of fact are supported by “clear and convincing

 evidence,” N.C. Gen. Stat. § 7B-807(a) (2021), and whether the findings of fact support

 the trial court’s conclusions of law, In re Helms, 127 N.C. App. 505, 511, 491 S.E.2d

 672, 676 (1997). Unchallenged findings of fact are deemed supported by the evidence

 and are binding on appeal. Koufman v. Koufman, 330 N.C. 93, 97, 408 S.E.2d 729,

 731 (1991). “[W]hether a trial court’s findings of fact support its conclusions of law is

 reviewed de novo.” In re J.S., 374 N.C. 811, 814, 845 S.E.2d 66, 71 (2020) (citation

 omitted). We otherwise review the trial court’s conclusions of law de novo. In re

 J.S.L., 177 N.C. App. 151, 154, 628 S.E.2d 387, 389 (2006).

¶ 14 A neglected juvenile is defined, in pertinent part, as one “whose parent,

 guardian, custodian, or caretaker does not provide proper care, supervision, or

 discipline; or who has been abandoned; or who is not provided necessary medical care;

 or who is not provided necessary remedial care; or who lives in an environment

 injurious to the juvenile’s welfare[.]” N.C. Gen. Stat. § 7B-101(15) (2021). “[F]or a

 court to find that the child resided in an injurious environment, evidence must show

 that the environment in which the child resided has resulted in harm to the child or

 a substantial risk of harm.” In re K.J.B., 248 N.C. App. 352, 354, 797 S.E.2d 516, 518

 (2016) (citation omitted).

¶ 15 In the present case, the trial court found that at under one year of age, Ken
 IN RE K.H.

 2022-NCCOA-3

 Opinion of the Court

 tested positive for “marijuana, methamphetamine, opiates, morphine, and 6-am

 (heroin).” The trial court also found that Father’s drug screen was “positive for

 tramadol, opiates, morphine, marijuana, fentanyl, and norfentanyl” and Mother’s

 drug screen was “positive for fentanyl, norfentanyl, opiates, morphine, and

 tramadol.” Respondents argue that these findings are based on incompetent hearsay

 evidence, but this argument is unavailing.

¶ 16 “‘Hearsay’ is a statement, other than one made by the declarant while

 testifying at the trial or hearing, offered in evidence to prove the truth of the matter

 asserted.” N.C. Gen. Stat. § 8C-1, Rule 801(c) (2021). Hearsay is inadmissible unless

 otherwise provided by statute or the rules of evidence. Id. § 8C-1, Rule 802 (2021).

¶ 17 Under the business records exception to the hearsay rule, certain records of

 regularly conducted activity are not excluded by the hearsay rule, even if the

 declarant is available as a witness. Id. § 8C-1, Rule 803(6) (2021). Such records

 include “[a] memorandum, report, record, or data compilation, in any form, of acts,

 events, conditions, opinions, or diagnoses, made at or near the time by, or from

 information transmitted by, a person with knowledge, if (i) kept in the course of a

 regularly conducted business activity and (ii) it was the regular practice of that

 business activity to make the memorandum, report, record, or data compilation[.]”

 Id.

¶ 18 Business records may be authenticated “by the testimony of the custodian or
 IN RE K.H.

 2022-NCCOA-3

 Opinion of the Court

 other qualified witness, or by affidavit or by document under seal . . . made by the

 custodian or witness, unless the source of information or the method or circumstances

 of preparation indicate lack of trustworthiness.” Id.; State v. Miller, 80 N.C. App.

 425, 429, 342 S.E.2d 553, 556 (1986). The term “other qualified witness” under Rule

 803(6) “has been construed to mean a witness who is familiar with the business

 entries and the system under which they are made.” Miller, 80 N.C. App. at 429, 342

 S.E.2d at 556 (citing State v. Galloway, 304 N.C. 485, 492, 284 S.E.2d 509, 514

 (1981)). It is well-established that a business record need not be authenticated by the

 person who made it. State v. Wilson, 313 N.C. 516, 533, 330 S.E.2d 450, 462 (1985);

 State v. Hicks, 243 N.C. App. 628, 640, 777 S.E.2d 341, 349 (2015).

¶ 19 In State v. Miller, this Court held that the results of an emergency room blood

 alcohol test were properly admitted under the business records exception to the

 hearsay rule. 80 N.C. App. at 428-29, 342 S.E.2d at 555-56. A nurse testified that

 she was present for the collection of defendant’s blood sample, saw the sample being

 taken to the hospital laboratory, retrieved the test results when they were ready, and

 returned the report to defendant’s bedside for review by a doctor. Id. Both the nurse

 and the doctor testified that the blood test at issue was part of routine treatment for

 patients such as defendant. Id. at 428, 342 S.E.2d at 555. We held that the records

 of the blood test results fell within the business records exception and the nurse and

 doctor were proper witnesses to authenticate the records, though they had not
 IN RE K.H.

 2022-NCCOA-3

 Opinion of the Court

 personally analyzed the sample. Id. at 429, 342 S.E.2d at 556.

¶ 20 In In re S.D.J., 192 N.C. App. 478, 665 S.E.2d 818 (2008), this Court held that

 the results of a drug test were properly admitted under the business record exception

 to the hearsay rule. Id. at 484, 665 S.E.2d at 822. A social worker employed by the

 petitioner department of social services testified that

 she collected all but one of the samples used in the drug
 tests and then sealed and shipped the samples to the
 laboratory for testing. She further testified that she relied
 on the reports [of the laboratory] in the ordinary course of
 her business and that the reports were collected as part of
 petitioner’s record in this particular case.

 Id. at 483, 665 S.E.2d at 822. We held that the trial court did not err in admitting

 the record of the results under the business records exception because the social

 worker, “in the course of regularly conducted business activity, collected respondent’s

 sample, ordered the drug test and subsequently filed the results of the drug test with

 her office.” Id. at 484, 665 S.E.2d at 822.

¶ 21 Like the nurse and doctor in Miller and the social worker in S.D.J., Barnes was

 a qualified witness to authenticate the records of the positive drug test results.

 Barnes testified that as president and owner of UBS, he acted as custodian of the

 company’s records, and UBS had a policy of retaining records for 12 months. Barnes

 testified that UBS sends samples it collects to Omega Laboratories and explained the

 procedures Omega Laboratories employs to maintain chain of custody and test the
 IN RE K.H.

 2022-NCCOA-3

 Opinion of the Court

 samples. Barnes explained that Omega Laboratories produces a lab report once the

 testing process is complete, which then undergoes review by an independent Medical

 Review Officer prior to transmittal to UBS.

¶ 22 With respect to Ken’s test, Barnes testified that UBS collected Ken’s hair

 sample on 16 September 2020, sent the sample to Omega Laboratories, and received

 the report of Ken’s tests on 23 September 2020 after review by the independent

 Medical Review Officer. Barnes testified that the reports admitted at the hearing

 were “true and correct copies of the records that were made,” that “to the best of [his]

 knowledge, these records were all made on persons having knowledge,” and the

 records were made “during the regular course of business at or near the time of the

 events recorded.”

¶ 23 Barnes was qualified to authenticate the results of the tests under the business

 records exception, though he did not personally perform the drug tests, because his

 testimony demonstrated that he was “familiar with the business entries and the

 system under which they are made.” Miller, 80 N.C. App. at 429, 342 S.E.2d at 556.

 Barnes’ testimony sufficiently demonstrated that the records were made by someone

 with knowledge, and were transmitted and retained in the course of UBS and Omega

 Laboratories’ regularly conducted business activities. Accordingly, the trial court did

 not err in admitting the reports containing the results of the drug tests pursuant to

 the business records exception to the hearsay rule.
 IN RE K.H.

 2022-NCCOA-3

 Opinion of the Court

¶ 24 The properly admitted drug test results supported the trial court’s finding that

 Ken “was positive for marijuana, methamphetamine, opiates, morphine, and 6-am

 (heroin).” The finding that Ken was positive for these substances at 10 months old

 amply demonstrates that Ken lived in an environment injurious to his welfare

 because “the environment in which [Ken] resided has resulted in harm[.]” In re

 K.J.B., 248 N.C. App. at 354, 797 S.E.2d at 518.

¶ 25 Even disregarding the findings challenged by Respondents, the trial court’s

 unchallenged findings of fact alone support the trial court’s adjudication of neglect.

 The unchallenged findings reflect that both parents “admitted to previous substance

 use, including intravenous heroin use” and admitted to “getting subutex or suboxone

 off the streets.” Respondents correctly note that a parent’s substance abuse problem

 alone cannot support an adjudication of neglect. See id. at 355, 797 S.E.2d at 518

 (citing In re E.P., 183 N.C. App. 301, 645 S.E.2d 772, aff’d per curiam, 362 N.C. 82,

 653 S.E.2d 143 (2007)). But here, the unchallenged findings reveal further

 circumstances posing a substantial risk of harm to Ken: Two heroin overdoses

 necessitating emergency medical response occurred in the home in July and

 September of 2020. Drug paraphernalia was also present in and about the home on

 different occasions. Beketov confiscated drug paraphernalia from the home in

 February 2020 and a SCDSS social worker “located a used needle in the front yard,

 close to the front door of the home” in September 2020. During SCDSS’s investigation
 IN RE K.H.

 2022-NCCOA-3

 Opinion of the Court

 in September 2020, Ken was “10 months of age, crawling, and pulling up.”

 Respondents did not indicate that anyone other than themselves cared for Ken for

 any length of time. Taken as a whole, these findings show a prolonged period of drug

 use in the home, by both Respondents and others, during which Ken was placed at

 risk of exposure to drugs and drug paraphernalia. These findings in turn support the

 conclusion that Ken was neglected because he lived in an injurious environment—

 one that posed him a substantial risk of harm. In re K.J.B., 248 N.C. App. at 354,

 797 S.E.2d at 518.

¶ 26 The trial court properly admitted the results of Ken’s drug tests pursuant to

 the business records exception to the hearsay rule. The trial court’s findings of fact

 based on this evidence supported its conclusion that Ken was a neglected juvenile.

 Even disregarding the findings challenged by Respondents, the trial court’s

 unchallenged findings concerning the prolonged use of drugs and presence of

 paraphernalia in the home support its conclusion that Ken was a neglected juvenile.2

 B. Disposition Order

¶ 27 Mother argues that the disposition order must be reversed because the trial

 court “abused its discretion by unnecessarily separating Ken from his mother.”

 2 Because the unchallenged findings of fact support the trial court’s adjudication of

 neglect, we do not reach Respondents’ challenge to certain findings pertaining to allegedly
 stolen property and other findings of fact on the ground that they were based upon the trial
 court’s erroneous admission of expert testimony from Barnes.
 IN RE K.H.

 2022-NCCOA-3

 Opinion of the Court

¶ 28 “The district court has broad discretion to fashion a disposition from the

 prescribed alternatives . . . based upon the best interests of the child.” In re B.W.,

 190 N.C. App. 328, 336, 665 S.E.2d 462, 467 (2008). We review a disposition order

 only for an abuse of discretion. Id. “An abuse of discretion occurs when the trial

 court’s ruling is so arbitrary that it could not have been the result of a reasoned

 decision.” In re A.P.W., 2021-NCSC-93, ¶ 15, 378 N.C. 405, 410 (quotation marks and

 citation omitted).

¶ 29 Because Respondents do not challenge the findings of fact in the trial court’s

 Amended Disposition Order, those findings are binding on appeal. Koufman, 330

 N.C. at 97, 408 S.E.2d at 731. The findings reflect that Ken was “thriving in the

 relative placement,” “all of his needs [were] being met,” he “ha[d] access to normal

 childhood activities and developmentally appropriate toys,” and was “receiving

 routine and special medical and dental care.” In October 2020, Mother entered into

 a case plan with SCDSS to address “Mental Health/Substance Abuse, Random Drug

 Screens, Parenting, Housing and basic needs, and Employment.” Pursuant to her

 plan, Mother completed an assessment and began an outpatient therapy program.

 Mother also secured employment and housing, though the housing was described only

 as “a building behind her grandmother’s home.” From November 2020 until the

 disposition hearing in March 2021, Mother visited Ken only five times. From October

 2020 until the disposition hearing, Mother refused drug screens twice, could not be
 IN RE K.H.

 2022-NCCOA-3

 Opinion of the Court

 reached by SCDSS for drug screens twice, and tested positive on two drug screens.

 Mother attended just four of eleven classes with the “Legacy Center” between

 completing her intake assessment in October 2020 and the disposition hearing.

¶ 30 In light of these findings, the trial court’s decision to continue custody of Ken

 with SCDSS, maintain Ken’s relative placement, and maintain reunification as the

 permanent plan was not “so arbitrary that it could not have been the result of a

 reasoned decision.” In re A.P.W., 2021-NCSC-93, ¶ 15, 378 N.C. at 410 (quotation

 marks and citation omitted).

 III. Conclusion

¶ 31 Because the trial court’s findings showed that Ken lived in an environment

 injurious to his welfare, the trial court did not err in adjudicating Ken a neglected

 juvenile. The trial court did not abuse its discretion in maintaining Ken’s custody

 with DSS and placement with a relative where Ken was thriving in the placement

 and Mother had made some progress under her case plan.

 AFFIRMED.

 Judges DILLON and ZACHARY concur.