IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-3

No. COA21-379

Filed 4 January 2022

Surry County, No. 20 JA 124

IN THE MATTER OF: K.H.

Appeal by Respondents from orders entered 26 and 29 April 2021 by Judge Spencer G. Key, Jr., in Surry County District Court. Heard in the Court of Appeals 1 December 2021.

*Susan Curtis Campbell for Petitioner-Appellee Surry County Department of Social Services.*

*James N. Freeman, Jr., for Appellee Guardian ad Litem.*

*Stam Law Firm, PLLC, by R. Daniel Gibson, for Respondent-Appellant Mother.*

*Anné C. Wright for Respondent-Appellant Father.*

COLLINS, Judge.

¶ 1      Respondent-Father and Respondent-Mother appeal from orders adjudicating their son, Ken, a neglected juvenile and maintaining his custody with the department of social services.[1] Because the trial court's findings of fact support its conclusion that Ken was a neglected juvenile and the trial court did not abuse its discretion with respect to disposition, we affirm.

---

[1] Various imperfections in the notices of appeal, none of which the parties raise, are not jurisdictional defects.

## I.    Background

On 15 September 2020, Petitioner Surry County Department of Social Services ("SCDSS") received a report "alleging substance use by the Respondents which was impacting their care of" Ken, as well as "an injurious environment impacting [Ken's] safety."  On 24 September 2020, SCDSS filed a juvenile petition alleging that Ken was neglected.  The trial court held adjudication and disposition hearings on 25 and 26 March 2021.

At the adjudication hearing, Petitioner presented testimony from Audrey Huston, a SCDSS social worker; Jonathan Young, a paramedic with Surry County Emergency Services; officer Jody Beketov of the Mount Airy Police Department; and Michael Barnes, president and owner of Unique Background Solutions ("UBS"). Beketov testified that when she first came to Respondents' residence on 26 February 2020 to investigate possible stolen property, she observed Mother taking Ken to a neighbor's house.  Beketov searched the Respondents' residence with Mother's consent and found "a burnt spoon and a used syringe" in the bathroom trash can and "a clear plastic baggy that had a crystal-like substance inside" under the toilet seat. Over objection, Beketov testified that she identified pills in the plastic bag as alprazolam based on visual inspection and identified other substances in the bag as methamphetamine and fentanyl based on field tests.  Beketov also found "several paraphernalia items located throughout the residence," but could not specifically

recall what they were. Beketov twice went to Respondents' residence when Ken's paternal grandmother overdosed and required EMS attention on 30 July and 16 September 2020.

¶ 4        Barnes testified that UBS was the collection agency contracted with SCDSS to provide drug screens. Barnes had "[j]ust over 15 years" of experience with UBS collecting both hair and urine specimens, was a "qualified train the trainer under Department of Transportation qualifications"; received training from Omega Laboratories, the lab where UBS submitted its hair follicle specimens; and was "DOT qualified" for 12 years.

¶ 5        Barnes explained UBS' process for collecting, securing, and submitting hair and urine specimens for drug testing as follows: The individual undergoing testing gives a specimen at a UBS facility. For urine specimens, UBS conducts an instant test. If the instant test gives a non-negative result, UBS sends the specimen to a laboratory for confirmatory testing. For hair specimens, Omega Laboratories measures the specimen, "run[s] it through a wash . . . to remove any environmental contaminants," performs an immunoassay screening, and "if there are non-negatives presented in the screen, it is then passed onto the confirmation" with gas chromatography mass spectrometry. Once the tests are complete, a laboratory report is generated and passed onto "a medical review officer who is separate from the lab." The medical review officer's responsibility is to communicate with the specimen donor

and determine whether any valid prescriptions explain a positive test result.

¶ 6        According to Barnes, a specimen of Ken's hair was collected at a UBS facility on 16 September 2020 and sent for analysis at Omega Laboratories. Counsel for each Respondent objected to the admission of the results of Ken's tests. Following argument, the trial court concluded that Barnes "qualifies as an expert at least in the area of understanding how tests are performed, not actually doing the performing of them and examining, but certainly analyzing. He's able in his capacity to analyze the data he receives from a lab[.]"

¶ 7        The trial court admitted the reports containing the results of Mother, Father, and Kens' drug screens. The trial court permitted Barnes to testify that Ken's test was positive for marijuana, methamphetamines, 6-AM heroin, and morphine. The trial court likewise permitted Barnes to testify, again over objection, that a urine sample from Mother was positive for fentanyl, norfentanyl, morphine, and tramadol; and a urine sample from Father was positive for marijuana, fentanyl, norfentanyl, morphine, and tramadol.

¶ 8        On 26 April 2021, the trial court entered an order adjudicating Ken a neglected juvenile ("Adjudication Order"). The Adjudication Order included the following pertinent findings of fact:

> 7.    During [SCDSS's] assessment of the report, the Department found the juvenile to be 10 months of age, crawling, and pulling up.

8. The Respondents admitted to previous substance use, including intravenous heroin use, but claimed they had been clean for several weeks. The Respondents admitted that they were both getting subutex or suboxone off the streets.

9. The Respondents entered into a Safety Plan with the Department that the child would have a safe, sober caretaker at all times, and the child would have no access to drug paraphernalia.

10. During the ensuing investigation of the report, the Social Worker learned that the Respondent Mother had been found in possession of Schedule I, II, and IV controlled substances, drug paraphernalia, including a burnt spoon and used needle, and stolen property, on or about February 26, 2020, after a search of the home was conducted.

11. Additionally, it was determined by the Department that an overdose had occurred in the home during July 2020.

13. [sic] On 9/16/2020, the Respondent Parents submitted to urine drug screens and the instant test results showed the father positive for marijuana, tramadol, benzodiazepine, and fentanyl; the mother's instant screen was positive for fentanyl and tramadol.

14. On 9/16/2020, a hair drug screen was completed on the juvenile, and on 9/24/2020, the test results indicated the child was positive for marijuana, methamphetamine, opiates, morphine, and 6-am (heroin).

15. On 9/24/2020, the Respondent Parents' confirmed drug screen results indicated that the father was positive for tramadol, opiates, morphine, marijuana, fentanyl, and norfentanyl, and the mother was positive for fentanyl, norfentanyl, opiates, morphine, and tramadol; additionally, on 9/16/2020, the Social Worker located a used needle in the front yard, close to the front door of the

home.

16. Officer Beketov with the Mount Airy Police Department conducted the search of the home on or about 2/26/2020, and did find and confiscate controlled substances, paraphernalia, and stolen property in the home for which Juvenile Petitions were filed against the Respondent Mother in Juvenile Court due to the mother's minority at the time.

17. Officer Beketov also testified that just prior to her search of the home, the officer observed the Respondent Mother taking the juvenile to the next-door neighbor's home, and as Officer Beketov was leaving the residence, following the search and confiscation of the substances, paraphernalia, and stolen property, the mother retrieved the child from the neighbor.

18. Jonathan Young, Surry County EMS Paramedic, testified that he was dispatched to the home of the Respondent Parents and juvenile on July 30, 2020, due to an unconscious female in the home, and when he arrived, two individuals were performing CPR on the woman.

19. Mr. Young testified that four cans of Narcan were used to revive the unconscious and unresponsive woman, and after she became conscious, the woman identified herself as Jana Torres and she admitted to taking heroin.

20. During her testimony, Officer Beketov corroborated the testimony of Jon[a]than Young as she had also responded to the home . . . on July 30, 2020 and had observed the events there as well.

21. Officer Beketov spoke with the Respondent Father about what had occurred in the home on 7/30/2020, and both he and the paternal uncle, Bryson, provided information to police and EMS, indicating that the woman that was receiving emergency services was their mother, Jana Torres, and that their mother uses

methamphetamine and heroin, but neither knew what substance she had consumed that day.

22. Officer Beketov also testified that Jana Torres overdosed, again, in the home of the Respondents and juvenile, on 9/16/2020, and that Ms. Torres again admitted overdosing on heroin.

23. The Respondent Parents, when asked by the Department about any persons providing care for the juvenile other than themselves, did not provide any information about the child being out of the parents' care for any length of time.

24. On 9/30/2020, the Respondent Mother admitted to the Department that both she and the Respondent Father needed to go to the Crisis Recovery Center in Statesville, for detox treatment.

25. Michael Barnes testified regarding the process and procedures used for collecting and testing specimens for urine and hair drug screens.

26. Mr. Barnes provided a detailed description of the care and safeguards used in collecting drug screen specimens, and the steps employed each time a specimen is provided to avoid contamination, misidentification, and to protect the chain of custody of the specimen to the outside laboratory.

27. Mr. Barnes has been in the field of drug testing for more than 15 years, and through experience and continuing training and education, has become a trainer in the field.

28. While Mr. Barnes was unable to provide an exact description of the science of the method employed in the laboratory testing of the specimens Unique Background Solutions sends to the outside laboratories, he did expand on his duty to the Department and other contracting

entities to ensure the techniques, accuracy, and protocols inherent in reliable drug testing.

29. Mr. Barnes also testified that Unique Background Solutions contracts with outside laboratories, Quest Diagnostics and Omega Laboratories, because both labs are leaders in the industry for being accurate and reliable.

30. Further, Mr. Barnes testified that the method used by Omega Laboratories in testing hair specimens employs a chemical wash to eliminate all outside contaminates before the inside of the hair shaft is tested using Gas Chromatography/Mass Spectrometry ("GC/MS").

31. GCMS is considered to be the criterion standard for confirmatory testing, and has been widely used in the science of forensics such as arson investigations, employment drug testing, used to deny unemployment benefits, probation and parole matters, arbitrations, child custody, random drug testing, and is currently defined as the standard for confirmatory drug screening in the NC Medicaid Drug Testing for Opioid Treatment and Controlled Substance Monitoring . . . .

32. GC/MS screening detects a drug metabolite produced by the body.

33. With the exception of marijuana metabolites, which the Respondent Father tested positive for, the Respondents tested positive for the same substances.

34. The juvenile's hair specimen was approximate 1.5 inches in length, and according to Mr. Barnes, hair grows at an average of 1/2 inch per month, and therefore, a hair drug screen provides a window of approximately 90 days back in time for detecting illicit substances.

35. Mr. Barnes also testified that heroin metabolizes quickly in the body to the first metabolite, 6-AM, and then again, to morphine.

36. The Court found the evidence of the Respondents' and juvenile's drug screens proffered by the Department to be reliable and accurate.

¶ 9 Upon the Adjudication Order, the trial court entered a Juvenile Disposition Order on 26 April 2021 ("Initial Disposition Order"). The trial court maintained legal and physical custody of Ken with SCDSS, directed that Ken remain in his current relative placement, maintained reunification as the permanent plan, and granted both parents "a minimum of once weekly visitations, for two hours, supervised."

¶ 10 On 29 April 2021, the trial court entered an Amended Juvenile Disposition Order ("Amended Disposition Order") which contained the same custody and visitation provisions as the Initial Disposition Order, but included additional findings of fact.

¶ 11 Both Mother and Father noticed appeal.

## II.    Discussion

### A. Adjudication of Neglect

¶ 12 Respondents challenge many of the trial court's adjudicatory findings of fact concerning the drug test results, the presence of controlled substances in the home, and the presence of stolen property in the home. Respondents argue that these findings are based on erroneously admitted evidence and are otherwise unsupported, and that the remaining findings of fact do not support the trial court's conclusion of law that Ken was neglected.

¶ 13        We review an adjudication of abuse, neglect, or dependency to determine whether the trial court's findings of fact are supported by "clear and convincing evidence," N.C. Gen. Stat. § 7B-807(a) (2021), and whether the findings of fact support the trial court's conclusions of law, *In re Helms*, 127 N.C. App. 505, 511, 491 S.E.2d 672, 676 (1997). Unchallenged findings of fact are deemed supported by the evidence and are binding on appeal. *Koufman v. Koufman*, 330 N.C. 93, 97, 408 S.E.2d 729, 731 (1991). "[W]hether a trial court's findings of fact support its conclusions of law is reviewed de novo." *In re J.S.*, 374 N.C. 811, 814, 845 S.E.2d 66, 71 (2020) (citation omitted). We otherwise review the trial court's conclusions of law de novo. *In re J.S.L.*, 177 N.C. App. 151, 154, 628 S.E.2d 387, 389 (2006).

¶ 14        A neglected juvenile is defined, in pertinent part, as one "whose parent, guardian, custodian, or caretaker does not provide proper care, supervision, or discipline; or who has been abandoned; or who is not provided necessary medical care; or who is not provided necessary remedial care; or who lives in an environment injurious to the juvenile's welfare[.]" N.C. Gen. Stat. § 7B-101(15) (2021). "[F]or a court to find that the child resided in an injurious environment, evidence must show that the environment in which the child resided has resulted in harm to the child or a substantial risk of harm." *In re K.J.B.*, 248 N.C. App. 352, 354, 797 S.E.2d 516, 518 (2016) (citation omitted).

¶ 15        In the present case, the trial court found that at under one year of age, Ken

tested positive for "marijuana, methamphetamine, opiates, morphine, and 6-am (heroin)." The trial court also found that Father's drug screen was "positive for tramadol, opiates, morphine, marijuana, fentanyl, and norfentanyl" and Mother's drug screen was "positive for fentanyl, norfentanyl, opiates, morphine, and tramadol." Respondents argue that these findings are based on incompetent hearsay evidence, but this argument is unavailing.

¶ 16 "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.C. Gen. Stat. § 8C-1, Rule 801(c) (2021). Hearsay is inadmissible unless otherwise provided by statute or the rules of evidence. *Id.* § 8C-1, Rule 802 (2021).

¶ 17 Under the business records exception to the hearsay rule, certain records of regularly conducted activity are not excluded by the hearsay rule, even if the declarant is available as a witness. *Id.* § 8C-1, Rule 803(6) (2021). Such records include "[a] memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if (i) kept in the course of a regularly conducted business activity and (ii) it was the regular practice of that business activity to make the memorandum, report, record, or data compilation[.]" *Id.*

¶ 18 Business records may be authenticated "by the testimony of the custodian or

other qualified witness, or by affidavit or by document under seal . . . made by the custodian or witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness." *Id.*; *State v. Miller*, 80 N.C. App. 425, 429, 342 S.E.2d 553, 556 (1986). The term "other qualified witness" under Rule 803(6) "has been construed to mean a witness who is familiar with the business entries and the system under which they are made." *Miller*, 80 N.C. App. at 429, 342 S.E.2d at 556 (citing *State v. Galloway*, 304 N.C. 485, 492, 284 S.E.2d 509, 514 (1981)). It is well-established that a business record need not be authenticated by the person who made it. *State v. Wilson*, 313 N.C. 516, 533, 330 S.E.2d 450, 462 (1985); *State v. Hicks*, 243 N.C. App. 628, 640, 777 S.E.2d 341, 349 (2015).

¶ 19        In *State v. Miller*, this Court held that the results of an emergency room blood alcohol test were properly admitted under the business records exception to the hearsay rule. 80 N.C. App. at 428-29, 342 S.E.2d at 555-56. A nurse testified that she was present for the collection of defendant's blood sample, saw the sample being taken to the hospital laboratory, retrieved the test results when they were ready, and returned the report to defendant's bedside for review by a doctor. *Id.* Both the nurse and the doctor testified that the blood test at issue was part of routine treatment for patients such as defendant. *Id.* at 428, 342 S.E.2d at 555. We held that the records of the blood test results fell within the business records exception and the nurse and doctor were proper witnesses to authenticate the records, though they had not

personally analyzed the sample. *Id.* at 429, 342 S.E.2d at 556.

¶ 20        In *In re S.D.J.*, 192 N.C. App. 478, 665 S.E.2d 818 (2008), this Court held that the results of a drug test were properly admitted under the business record exception to the hearsay rule. *Id.* at 484, 665 S.E.2d at 822. A social worker employed by the petitioner department of social services testified that

> she collected all but one of the samples used in the drug tests and then sealed and shipped the samples to the laboratory for testing. She further testified that she relied on the reports [of the laboratory] in the ordinary course of her business and that the reports were collected as part of petitioner's record in this particular case.

*Id.* at 483, 665 S.E.2d at 822. We held that the trial court did not err in admitting the record of the results under the business records exception because the social worker, "in the course of regularly conducted business activity, collected respondent's sample, ordered the drug test and subsequently filed the results of the drug test with her office." *Id.* at 484, 665 S.E.2d at 822.

¶ 21        Like the nurse and doctor in *Miller* and the social worker in *S.D.J.*, Barnes was a qualified witness to authenticate the records of the positive drug test results. Barnes testified that as president and owner of UBS, he acted as custodian of the company's records, and UBS had a policy of retaining records for 12 months. Barnes testified that UBS sends samples it collects to Omega Laboratories and explained the procedures Omega Laboratories employs to maintain chain of custody and test the

samples. Barnes explained that Omega Laboratories produces a lab report once the testing process is complete, which then undergoes review by an independent Medical Review Officer prior to transmittal to UBS.

¶ 22        With respect to Ken's test, Barnes testified that UBS collected Ken's hair sample on 16 September 2020, sent the sample to Omega Laboratories, and received the report of Ken's tests on 23 September 2020 after review by the independent Medical Review Officer. Barnes testified that the reports admitted at the hearing were "true and correct copies of the records that were made," that "to the best of [his] knowledge, these records were all made on persons having knowledge," and the records were made "during the regular course of business at or near the time of the events recorded."

¶ 23        Barnes was qualified to authenticate the results of the tests under the business records exception, though he did not personally perform the drug tests, because his testimony demonstrated that he was "familiar with the business entries and the system under which they are made." *Miller*, 80 N.C. App. at 429, 342 S.E.2d at 556. Barnes' testimony sufficiently demonstrated that the records were made by someone with knowledge, and were transmitted and retained in the course of UBS and Omega Laboratories' regularly conducted business activities. Accordingly, the trial court did not err in admitting the reports containing the results of the drug tests pursuant to the business records exception to the hearsay rule.

The properly admitted drug test results supported the trial court's finding that Ken "was positive for marijuana, methamphetamine, opiates, morphine, and 6-am (heroin)." The finding that Ken was positive for these substances at 10 months old amply demonstrates that Ken lived in an environment injurious to his welfare because "the environment in which [Ken] resided has resulted in harm[.]" *In re K.J.B.*, 248 N.C. App. at 354, 797 S.E.2d at 518.

Even disregarding the findings challenged by Respondents, the trial court's unchallenged findings of fact alone support the trial court's adjudication of neglect. The unchallenged findings reflect that both parents "admitted to previous substance use, including intravenous heroin use" and admitted to "getting subutex or suboxone off the streets." Respondents correctly note that a parent's substance abuse problem alone cannot support an adjudication of neglect. *See id.* at 355, 797 S.E.2d at 518 (citing *In re E.P.*, 183 N.C. App. 301, 645 S.E.2d 772, *aff'd per curiam*, 362 N.C. 82, 653 S.E.2d 143 (2007)). But here, the unchallenged findings reveal further circumstances posing a substantial risk of harm to Ken: Two heroin overdoses necessitating emergency medical response occurred in the home in July and September of 2020. Drug paraphernalia was also present in and about the home on different occasions. Beketov confiscated drug paraphernalia from the home in February 2020 and a SCDSS social worker "located a used needle in the front yard, close to the front door of the home" in September 2020. During SCDSS's investigation

in September 2020, Ken was "10 months of age, crawling, and pulling up." Respondents did not indicate that anyone other than themselves cared for Ken for any length of time. Taken as a whole, these findings show a prolonged period of drug use in the home, by both Respondents and others, during which Ken was placed at risk of exposure to drugs and drug paraphernalia. These findings in turn support the conclusion that Ken was neglected because he lived in an injurious environment—one that posed him a substantial risk of harm. *In re K.J.B.*, 248 N.C. App. at 354, 797 S.E.2d at 518.

The trial court properly admitted the results of Ken's drug tests pursuant to the business records exception to the hearsay rule. The trial court's findings of fact based on this evidence supported its conclusion that Ken was a neglected juvenile. Even disregarding the findings challenged by Respondents, the trial court's unchallenged findings concerning the prolonged use of drugs and presence of paraphernalia in the home support its conclusion that Ken was a neglected juvenile.[2]

**B. Disposition Order**

Mother argues that the disposition order must be reversed because the trial court "abused its discretion by unnecessarily separating Ken from his mother."

---

[2] Because the unchallenged findings of fact support the trial court's adjudication of neglect, we do not reach Respondents' challenge to certain findings pertaining to allegedly stolen property and other findings of fact on the ground that they were based upon the trial court's erroneous admission of expert testimony from Barnes.

¶ 28    "The district court has broad discretion to fashion a disposition from the prescribed alternatives . . . based upon the best interests of the child." *In re B.W.*, 190 N.C. App. 328, 336, 665 S.E.2d 462, 467 (2008). We review a disposition order only for an abuse of discretion. *Id.* "An abuse of discretion occurs when the trial court's ruling is so arbitrary that it could not have been the result of a reasoned decision." *In re A.P.W.*, 2021-NCSC-93, ¶ 15, 378 N.C. 405, 410 (quotation marks and citation omitted).

¶ 29    Because Respondents do not challenge the findings of fact in the trial court's Amended Disposition Order, those findings are binding on appeal. *Koufman*, 330 N.C. at 97, 408 S.E.2d at 731. The findings reflect that Ken was "thriving in the relative placement," "all of his needs [were] being met," he "ha[d] access to normal childhood activities and developmentally appropriate toys," and was "receiving routine and special medical and dental care." In October 2020, Mother entered into a case plan with SCDSS to address "Mental Health/Substance Abuse, Random Drug Screens, Parenting, Housing and basic needs, and Employment." Pursuant to her plan, Mother completed an assessment and began an outpatient therapy program. Mother also secured employment and housing, though the housing was described only as "a building behind her grandmother's home." From November 2020 until the disposition hearing in March 2021, Mother visited Ken only five times. From October 2020 until the disposition hearing, Mother refused drug screens twice, could not be

reached by SCDSS for drug screens twice, and tested positive on two drug screens. Mother attended just four of eleven classes with the "Legacy Center" between completing her intake assessment in October 2020 and the disposition hearing.

¶ 30        In light of these findings, the trial court's decision to continue custody of Ken with SCDSS, maintain Ken's relative placement, and maintain reunification as the permanent plan was not "so arbitrary that it could not have been the result of a reasoned decision." *In re A.P.W.*, 2021-NCSC-93, ¶ 15, 378 N.C. at 410 (quotation marks and citation omitted).

## III.    Conclusion

¶ 31        Because the trial court's findings showed that Ken lived in an environment injurious to his welfare, the trial court did not err in adjudicating Ken a neglected juvenile. The trial court did not abuse its discretion in maintaining Ken's custody with DSS and placement with a relative where Ken was thriving in the placement and Mother had made some progress under her case plan.

AFFIRMED.

Judges DILLON and ZACHARY concur.